**CHOICE HOTELS INTERNATIONAL, INC.**
**WOODSPRING SUITES FRANCHISE AGREEMENT**

# WOODSPRING SUITES FRANCHISE AGREEMENT

## Table of Contents

Page

| | | |
|---|---|---|
| ARTICLE 1 | ACKNOWLEDGMENTS AND REPRESENTATIONS; DEFINITIONS. | 1 |
| ARTICLE 2 | GRANT OF LICENSE. | 6 |
| ARTICLE 3 | TERM. | 7 |
| ARTICLE 4 | FEES AND ROYALTIES. | 7 |
| ARTICLE 5 | PROPERTY CONSTRUCTION AND OPENING. | 8 |
| ARTICLE 6 | DUTIES OF FRANCHISOR. | 11 |
| ARTICLE 7 | GENERAL DUTIES OF FRANCHISEE. | 12 |
| ARTICLE 8 | QUALITY CONTROL AND SUPERVISION. | 18 |
| ARTICLE 9 | MARKETING AND RESERVATIONS. | 21 |
| ARTICLE 10 | FINANCIAL REPORTING. | 23 |
| ARTICLE 11 | PROPRIETARY MARKS AND TRADE SECRETS; COMPETITION. | 24 |
| ARTICLE 12 | INSURANCE AND INDEMNITY. | 27 |
| ARTICLE 13 | TRANSFER OF INTEREST OR MANAGEMENT. | 30 |
| ARTICLE 14 | DEFAULT AND TERMINATION. | 34 |
| ARTICLE 15 | OBLIGATIONS UPON TERMINATION. | 36 |
| ARTICLE 16 | ADDITIONAL COVENANTS. | 39 |
| ARTICLE 17 | APPROVALS AND WAIVERS. | 40 |
| ARTICLE 18 | NOTICES. | 40 |
| ARTICLE 19 | DISPUTE RESOLUTION. | 40 |
| ARTICLE 20 | ENTIRE AGREEMENT/AMENDMENT. | 42 |
| ARTICLE 21 | CONSTRUCTION AND MODIFICATION. | 43 |
| ARTICLE 22 | EXECUTION OF AGREEMENT. | 44 |

i

Schedule A – Ownership Breakdown

Attachment A – Property Improvement Plan
Attachment B – Rider to the Franchise Agreement
Attachment C – Personal Guaranty

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

## WOODSPRING SUITES
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (this "Agreement") is made and entered into at Rockville, Maryland this 23 day of April , 2018 (the "Effective Date"), by and between **Choice Hotels International, Inc.** (hereinafter referred to as "Franchisor"), and **POSH PROPERTIES NO. 41, WOODHAVEN LLC**, a Pennsylvania limited liability company. (hereinafter referred to as "Franchisee"), whose principal business address is 2216 Willow Park Road, Bethlehem PA, 18020.

### Recitals

A. Franchisor has developed and owns a concept and distinctive system for the design, decor, establishment, operation, and image of extended-stay properties under the Proprietary Marks utilizing certain Trade Secrets.

B. Franchisee desires to establish and operate a **132**-Sleeping Room **WoodSpring Suites®** property under the System and the Proprietary Marks located at **4000 Woodhaven Road, Philadelphia, PA 19154** ("Property") and wishes to obtain a franchise license from Franchisor for that purpose. This paragraph is referred to herein as "**Recital B.**"

C. Franchisee recognizes the benefits to be derived from being identified with and licensed to use the System and Franchisee understands and acknowledges the importance of operating the extended-stay property licensed hereunder in conformity with Franchisor's standards and specifications in order to enhance public acceptance of, and demand for, all System Properties.

D. Franchisor is relying upon the business skill, financial capacity, and character of Franchisee and its principals, and the guarantee of Franchisee's obligations by its principles, if applicable, as attached to this Agreement.

E. Franchisee's Designated Representative to represent Franchisee on all matters relating to this Agreement is **Jason Posh** whose address is **2216 Willow Park Road, Bethlehem PA, 18020**. This paragraph is referred to herein as "**Recital E.**"

**NOW, THEREFORE,** in consideration of the foregoing and of the promises contained herein, the parties agree as follows:

**Article 1      Acknowledgments and Representations; Definitions.**

1.1     <u>Acknowledgements and Representations</u>.  Franchisee acknowledges and represents to Franchisor, in order to induce Franchisor to enter this Agreement, as follows:

A. Franchisee has read this Agreement and Franchisor's franchise disclosure document ("FDD") and understands and accepts the terms, conditions, and covenants contained in this Agreement as being reasonably necessary to maintain Franchisor's standards of quality and service and the uniformity of those standards at each System Property in order to protect and preserve the goodwill of the Proprietary Marks.

B. Franchisee has conducted an independent investigation of the business contemplated by this Agreement. Franchisee recognizes that the nature of the business conducted by Franchisor may evolve and change over time; that an investment in System Property involves business risks

which have been considered by Franchisee; and that the success of the venture depends primarily upon Franchisee's business ability and efforts.

        C.     Franchisee has not received or relied upon any guarantee, expressed or implied, about the revenues, profits, or success of the business venture contemplated by this Agreement.

        D.     Other than the FDD, no representations have been made by Franchisor, its Affiliates, or by their respective members, managers, officers, employees, directors, and/or agents, and Franchisee has not relied on any representations that are contrary to or not contained in the terms contained in this Agreement or the FDD.

        E.     In all of their dealings with Franchisee, the members, managers, officers, employees, directors, and/or agents of Franchisor act only in a representative capacity, not in an individual capacity, and that this Agreement and all business dealings between Franchisee and such individuals as a result of this Agreement are solely between Franchisee and Franchisor.

        F.     All information contained in the application made by Franchisee to Franchisor is true, correct, and complete. Franchisee has made no incorrect statement in the application or failed to make any statement that would be necessary to make the statements in the application not misleading.

    1.2     <u>Definitions</u>. The definitions applicable throughout this Agreement are set forth below:

        A.     "Affiliate" shall mean with respect to a person (including any legal person), (i) a person (including any legal person) that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such person; and (ii) any parent, spouse, lineal descendant or adopted child of such person, any spouse or adopted child of any such descendant or any child of such spouse, the executors, administrators, conservators or personal representatives of any such person or any person referred to in this clause (ii) and any person which, directly or indirectly, is owned or controlled by one or more of the persons referred to in this clause (ii).

        B.     "Affiliate System" shall mean another franchise system or chain owned and operated by Franchisor or its Affiliate under another name, trade name, service mark, trademark, logo, emblem, or other indication of origin than the Proprietary Marks.

        C.     "Affiliation Fee" shall mean the fee due upon execution and delivery of this Agreement as provided in Article 4.

        D.     "Agreement" shall have the meaning set forth in the introductory paragraph hereof.

        E.     "Approved Location" shall mean the street address set forth in **Recital B** above.

        F.     "Brand Standards" shall mean, collectively, the System standards, Brand Standards, and directions (whether in written, machine readable, electronic, or any other form), as they may be modified, amended or supplemented by Franchisor in its sole discretion, setting out the standards, methods, procedures, techniques and specifications of the System.

        G.     "Change in Control" shall mean (i) the acquisition, directly or indirectly, in one transaction or a series of related transactions, by any person or affiliated group of the beneficial ownership of ownership interest in Franchisee representing 51% or more of the equity interest in the Franchisee, (ii) any merger or consolidation of Franchisee other than a merger or consolidation where fifty one percent

(51%) or more of the total combined voting power of all outstanding ownership interest of the surviving entity or the acquiring entity, as the case may be, shall be received by and/or held immediately after the consummation of such transaction by one or more holders of the outstanding ownership interest of Franchisee, immediately prior to such transaction, or (iii) the sale, transfer, license or other disposition (in one transaction or a series of related transactions) of all or substantially all of the assets of Franchisee to which this Agreement relates.

H.     "Choice" shall mean Choice Hotels International, Inc.

I.     "Choice Brand Hotels" shall mean hotels that are authorized by Franchisor or its Affiliates to use the Choice Marks, participate in an Affiliate System, and/or participate in the Reservation System.

J.     "Choice Marks" shall mean collectively all of the trademarks and trade names, including, but not limited to, the Brand Mark, the trademarks and trade names ASCEND®, CAMBRIA®, COMFORT INN®, COMFORT SUITES®, CLARION®, QUALITY®, SLEEP INN®, MAINSTAY SUITES®, SUBURBAN EXTENDED STAY HOTEL®, WOODSPRING SUITES®, ECONO LODGE®, RODEWAY INN®, and the names of our Property Management System and Reservation System, together with all related logos, trade dress, and any other additional or substituted trademarks, trade names, service marks or logos (whether registered or not), that are currently owned, licensed or used by Franchisor or its Affiliates  or that Franchisor or its Affiliates later adopt, purchase or develop.

K.     "Commencement of Construction," "Commence Construction," "Commencing Construction" or "Construction Commencement" shall mean the date that footings are poured (or the equivalent thereof) at the Approved Location.

L.     "Competing Business" shall mean any property, motel, or other business that provides economy lodging accommodations on a weekly-stay basis with kitchen facilities and limited (not on a daily basis) maid service but will not include another hotel operated under the Proprietary Marks or under any other Choice Marks.

M.     "Construction Completion" shall have the meaning set forth in Section 5.3.

N.     "Controlling Interest" shall mean more than 50% of the voting interest in an entity, or such other ownership or voting interest that allows the holder thereof to control significant decisions in such entity.

O.     "Designated Representative" shall mean the person designated in **Recital E** of this Agreement to represent Franchisee on all matters relating to this Agreement and to receive notices under this Agreement on Franchisee's behalf.

P.     "Dispute" or "Disputes" shall mean any unsettled claims, disputes, or controversies between Franchisor and Franchisee, and other matters arising between them relating to this Agreement, the dealings or relationship between them, or Franchisee's development or operation of the Property.

Q.     "FF&E" shall mean fixtures, equipment, furnishings, furniture, telephone system, facsimile machine, computer systems, Reservation System, signs, supplies and other items used in the operation of the Property.

R.    "Franchised Business" shall mean the System Property licensed to, developed and operated by Franchisee under this Agreement.

S.    "Franchisee" shall have the meaning set forth in the introductory paragraph of this

T.    Agreement.

U.    "Franchisor" shall mean Choice Hotels International, Inc.

V.    "Incapacitated" or "Incapacity" means, the inability of Franchisee, or its majority owner if an entity, to operate the Franchised Business in the ordinary course of business for 30 days or more in any consecutive 90 day period.  If the parties are unable to agree whether the Franchisee, or its majority owner if an entity, is Incapacitated, the Incapacity will be determined by three physicians chosen in the following manner: Franchisee, its majority owner, or the Designated Representative shall select one physician and Franchisor shall select one, and the two physicians so chosen shall select a third physician. The physicians' majority decision shall be conclusive as to the Franchisee's or its majority owner's Incapacity.

W.    "Indemnitees" shall mean collectively Franchisor and its members, its affiliated companies, and each of their respective owners, shareholders, managers, agents, representatives, officers, directors, employees, partners, and other Affiliates.

X.    "Licensed Interests" shall have the meaning set forth in Section 13.2.

Y.    "Liquidated Damages" shall mean the damages to be paid by Franchisee pursuant to Section 15.5 for premature termination of this Agreement.

Z.    "Marketing Fee" shall mean the contribution to the Marketing Fund set forth in Section 4.1C.

AA.    "Marketing Fund" shall mean the Marketing, Branding, Sales and Advertising Fund provided for in Section 9.3.

BB.    "Opening" shall mean the date on which the Property first opens for business.

CC.    "Operations Data" shall have the meaning set forth in Section     10.6.

DD.    "Payment" or "Payments" shall have the meaning set forth in Section 4.2.

EE.    "Property" shall mean the extended-stay property operated by Franchisee under the Proprietary Marks under this Agreement.   The Property comprises all structures, facilities, appurtenances, FF&E, and entry, exit, parking and other areas located on the site of the Approved Location.

FF.    "Property Management System" shall mean the then-current version of the automated system that Franchisor will license to Franchisee on a non-exclusive basis to assist Franchisee in operating and managing the Property and to capture all data and record all transactions entered into by Franchisee and the Property in connection with the operation of the Property, including all transactions relating to the Sleeping Rooms.

GG.    "Proprietary Marks" shall mean the name "WoodSpring Suites®", "WoodSpring Suites Signature®", and such names and any other trade names, service marks, trademarks, logos, emblems,

or other indication of origin as are now or hereafter designated by Franchisor as part of the System. You shall identify the Property as "WoodSpring Suites" or "WoodSpring Suites Signature" as indicated in **Recital B** above.

HH.   "Quality Assurance Review Fine" shall have the meaning set forth in Section 8.4.

II.   "Reservation System" means the then-current methods and automated systems that Franchisor uses (including call centers and any and all related telecommunications systems, e-commerce tools and techniques, websites or mobile applications, call-forwarding or call-transfer programs and techniques or similar tools or methods used by us as modified from time to time) to take, hold, honor, and report advance reservations that are made in connection with the use of Sleeping Rooms at the Location and at the other System Properties or other Choice Brand Hotels.

JJ.   "Gross Room Revenue" shall mean revenues attributable to or payable for the use or occupancy of the Sleeping Rooms at the Property, including barter and credit transactions (before commissions and discounts for credit cards), whether or not collected, proceeds from any business interruption insurance or other loss of income insurance applicable to loss of revenues due to the non-availability of rooms, and proceeds for guaranteed no-show revenue which is collected, but excluding sales taxes, room taxes or other taxes collected by Franchisee from customers for transmittal to appropriate taxing authorities. Gross Room Revenue shall also exclude revenue derived from vending, laundry exchange, and laundry machines. Gross Room Revenue shall be accounted for in accordance with the Uniform System of Accounts for The Lodging Industry, Eleventh Revised Edition, 2014 (the "2014 11th Edition"), as published by the Hotel Association of New York City, Inc., except as otherwise provided in the accounting procedures set forth in the Brand Standards; subject, however, to the right of Franchisor to designate any subsequent edition or to designate a reasonable alternative accounting system if, the 2014 11th Edition is no longer recognized as the authoritative lodging accommodations accounting practice.

KK.   "Royalty Fee" shall mean the continuing royalty fee set forth in Section 4.1B.

LL.   "Sleeping Rooms" means the number of rooms set forth in **Recital B** of this Agreement, which is and shall be the total number of rentable sleeping rooms at the Property, subject to change only with Franchisor's prior written consent.

MM.   "System" shall mean the distinctive design, décor, color scheme, and furnishings; the Proprietary Marks designated to be part of the System; standards, specifications, programs and procedures for operations; programs and procedures for quality control; training and assistance; advertising, direct sales, and promotional programs developed by Franchisor for the operation of a Property under the Proprietary Marks utilizing the Trade Secrets providing value-oriented, extended-stay accommodations; and may, now or in the future, include the Property Management System and Reservation System, loyalty program, business referral, gift card and credit card agreements, this Agreement, the Brand Standards, and those identifying brand characteristics as Franchisor may from time to time reasonably designate. Franchisor may add, change, modify, withdraw, or otherwise revise any element of the System in its sole discretion. Franchisor may operate multiple franchise systems under different Proprietary Marks in which case, for purposes of this Agreement, "System" only encompasses the above to the extent applicable to the franchise system being licensed hereunder to the Franchisee.

NN.   "Systems Operations Data" shall have the meaning set forth in Section 10.6.

OO.   "System Properties" shall mean all WoodSpring Suites and WoodSpring Suites Signature Properties.

PP.    "Term" shall have the meaning set forth in Section 3.1.

QQ.    "Trade Secrets" shall mean confidential information, including, without limitation, (i) the design for System Properties, (ii) methods of service and operations at System Properties, (iii) knowledge of sales and profit performance at any one or more System Properties, (iv) knowledge of test programs, concepts, or results relating to operating, new advertising and promotional programs, (v) sources of suppliers of equipment, (vi) advertising, promotion, and marketing techniques, (vii) methods and information regarding the selection and training of managers and other employees for System Properties; and (viii) the Brand Standards. Trade Secrets may include confidential information used by the System and one or more Affiliate Systems.

RR.    "Transfer by Franchisee" shall mean the voluntary, involuntary, direct or indirect assignment, sale, gift, or other transfer of any Licensed Interest, including, without limitation, the following events: (i) the transfer of ownership of the stock or partnership or limited liability company ownership interest of Franchisee; (ii) any merger, reorganization, consolidation, or issuance of additional securities representing a direct or indirect ownership interest in Franchisee or the Property; (iii) any sale of a Controlling Interest in Franchisee in a single transaction or a related series of transactions; (iv) transfer of a Licensed Interest by declaration, division, or otherwise in a divorce, insolvency, corporate or partnership dissolution proceeding or otherwise by operation of law; (v) transfer of a Licensed Interest in the event of Franchisee's death or the death of one of its owners with a Controlling Interest, by will, declaration of or transfer in trust, or under the laws of intestate succession; (vi) any change in ownership or control of any or all of the Licensed Interest by sale, gift, assignment, or otherwise; (vii) if Franchisee or any owner with a Controlling Interest is a trust, any change in the trustees or the beneficial owners of the trust; or (viii) a pledge, hypothecation, or encumbrance of any Licensed Interest intended as security for an obligation.

SS.    "Franchisee Association" shall mean the WoodSpring Hotels Franchisee Association or any successor association related to the System or an Affiliate System that we designate.

TT.    "Website" means an interactive electronic document, series of symbols, or otherwise that is contained in a network or computers, and/or devices linked by communications software, and includes, without limitation, the Internet and World Wide Web home pages, profiles, accounts and other types of subsections of social networking sites, blogs, micro-blogs and other Internet and World Wide Web pages or parts thereof.

## Article 2    Grant of License.

2.1    Grant of License.  Subject to the terms and conditions of this Agreement, and to the continuous compliance by Franchisee with the terms and conditions of this Agreement, Franchisor hereby grants to Franchisee the nonexclusive right, and Franchisee undertakes the obligation, to operate the type of System Property specified in **Recital B** of this Agreement in accordance with Franchisor's mandatory standards and specifications, including the operational standards procedures and techniques as prescribed in the Brand Standards (as they may be changed, improved, and further developed by Franchisor from time to time), and to use the System (as it may be changed, improved, and further developed by Franchisor from time to time) and the Proprietary Marks and certain Choice Marks in connection therewith.

2.2    Approved Location.  Franchisee shall operate the Property at, and only at, the Approved Location.  If Franchisee's site application has not been approved at the time of this Agreement, **Recital B** of this Agreement shall be amended to list the Approved Location upon the unconditional approval of the site application by Franchisor.  Franchisee agrees that Franchisor and its Affiliates, are not restricted from using the System or any Affiliate System or engaging in or licensing any business activity including System

Properties or other lodging accommodations (including those operating as Choice Brand Hotels) at any other location, except as may be otherwise set forth in Article 2.

2.3     Limitations on Grant.  Franchisee agrees that (a) this license relates solely to the Approved Location, and (b) this Agreement does not entitle Franchisee to any protected territory, territorial rights, or exclusivity except as may be specifically set forth herein.  Franchisor reserves all rights not expressly granted to Franchisee in this Agreement.  Franchisee shall not expand or change the number of Sleeping Rooms in the Property without the prior written consent of Franchisor.

2.4     Non-Exclusive License.  The license granted hereby to use the Proprietary Marks and certain Choice Marks is non-exclusive, and Franchisee agrees that such Proprietary Marks and certain Choice Marks are and shall remain the property of Franchisor and its Affiliates and shall not be contested as to ownership or validity by Franchisee.  Franchisee understands and agrees that the grant of the license to use the Proprietary Marks and certain Choice Marks is conditioned upon Franchisee's agreement that: (a) the Proprietary Marks shall be used only in connection with the Franchised Business and only in the manner authorized by Franchisor; (b) Franchisee will not use the Proprietary Marks or Choice Marks or parts thereof as part of its corporate or other legal name, will identify itself as a Franchisee, and will comply with all fictitious name and other statutes in connection with its use of the Proprietary Marks; (c) Franchisee will cooperate with Franchisor in protecting and defending the Proprietary Marks; and (d) Franchisee will comply with Franchisor's designations of additions, deletions, and changes in the Proprietary Marks.

## Article 3     Term.

3.1     Term.  Unless sooner terminated or modified as hereinafter provided, the term of this Agreement shall be 20 years from the date of Opening of the Property (the "Term") and this Agreement will expire without notice on such date.

## Article 4     Fees And Royalties.

4.1     Fees.  In consideration of the rights and license granted herein, Franchisee shall pay to Franchisor each of the following:

A.     Upon the execution and delivery of this Agreement by Franchisee, Franchisee shall pay an Affiliation Fee of ████████ Franchisee acknowledges and agrees that such Affiliation Fee has been fully earned and is nonrefundable in consideration of expenses incurred, rights granted, services rendered, and other valuable consideration, the receipt and sufficiency of which is acknowledged by Franchisee.

B.     A continuing Royalty Fee of ████ of the preceding month's Gross Room Revenue during the Term.

C.     A Marketing Fee contribution to the Marketing Fund of ████ of the preceding month's Gross Room Revenue.  The Marketing Fund will be administered by Franchisor for the System as provided in Article 9 below.  Franchisee acknowledges and agrees that (i) Franchisor may increase the Marketing Fee due to cost increases attributable to inflation, increases in the costs of advertising, publicity, public relations or marketing, additional costs of implementing new or improved marketing, branding, sales, and advertising programs or systems, or any of the other relevant aspects of the System, so long as the increases apply to all or most of the U.S. hotels that are authorized to use the Proprietary Marks; (ii) Franchisor may assess additional fees and charges for various components of the System and other services (including promotional programs) as described in this Agreement and the Brand Standards; and (iii) Franchisor may advance monies for the purposes described herein in an amount reasonably necessary to ensure the provision of such services whether or not sufficient Marketing Fees are then available and

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

subsequently obtain reimbursement of such advances through the fee increases described above or utilizing future Marketing Fees to recover previous monies advanced.

D.    Such other fees that are set forth in other sections of this Agreement, the Brand Standards, or otherwise imposed.  Such fees shall be due as set forth in Section 4.2 of this Agreement, unless different payment terms are expressly stated for such fees at the time they are imposed or thereafter.

4.2    Payment.  Unless payments terms to the contrary are expressly stated in this Agreement or otherwise, all payments required by Article 4, and all other payments due to Franchisor on a continuing basis ("Payments"), shall be due to Franchisor by the twenty-fifth (25th) day after the end of the calendar month in which such Gross Room Revenue were received by Franchisee, provided that, Franchisor may, upon notice to Franchisee, collect such payments more frequently than monthly.  If any Payment due to Franchisor under this Agreement is overdue, Franchisee shall pay to Franchisor immediately upon demand the overdue amount, together with a late charge on such amount from the date it was due until paid, at the rate of ▆▆▆ per month, or the maximum rate permitted by law, whichever is less.  All Payments shall be made by wire transfer or electronic funds transfer.  In its sole discretion, Franchisor may collect Payments required by Article 4 by direct debit withdrawal by Franchisor from a designated bank account of Franchisee.  Franchisee acknowledges that nothing contained in this Article 4 shall constitute an agreement by Franchisor to accept such Payments after the same are due or a commitment by Franchisor to extend credit to, or otherwise finance Franchisee's operation of, the Property.  Franchisee acknowledges that Franchisee's failure to pay all such amounts when due shall constitute grounds for termination of this Agreement, as provided in Article 14 of this Agreement, notwithstanding the provisions of this Article.  The entitlement to such late charge shall be in addition to any other remedies Franchisor may have.

**Article 5    Property Construction and Opening.**

5.1    Construction.  If the Property is to be newly constructed, then prior to commencing construction of the Property under this Agreement, Franchisee shall have completed or satisfied all of the following:

A.    If Franchisee is obtaining the site for the Property by lease or installment land contract, Franchisee shall submit to Franchisor with a request for approval, prior to execution by Franchisee, a copy of the lease or installment land contract for the proposed site, which must not contain any provision that is inconsistent with or interferes with the performance of any provision of this Agreement (which lease or installment land contract must include provisions (i) authorizing Franchisor to enter the premises and make any modifications necessary to protect the Proprietary Marks, (ii) granting to Franchisor the right (but not the duty) to assume the lease or installment land contract if Franchisee is in default under its terms and provisions and/or if this Agreement expires or is terminated, (iii) requiring concurrent notice from lessor or vendor to Franchisor of any default or termination, and (iv) in the case of a lease, providing for a term of at least 25 years), which lease or installment land contract, when approved by Franchisor, shall not thereafter be materially modified without the prior written consent of Franchisor.  Under no circumstances shall Franchisor have any obligation or liability under such lease or installment land contract.

B.    Inform Franchisor by written notice, not less than thirty (30) days prior to Commencing Construction, of the name of the architect and the general contractor to be used for the construction of the Property, and such other information about the architect and general contractor as Franchisor may deem necessary.

C.    At least 6 months prior to Commencing Construction, submit to Franchisor with a request for approval, prior to preparation of the schematic design development documents for the building, preliminary site plans showing: (i) the dimensions of the site at the Approved Location; (ii) the location of

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

the site in relation to streets and other thoroughfares and adjoining properties; (iii) placement of the Property on the site; (iv) proposed drives, parking, and service areas; (v) proposed location of exterior signage including size, type, height, etc.; and (vi) such other information as may be reasonably required by Franchisor, which preliminary site plans, when approved by Franchisor, shall not thereafter be materially modified without the prior written consent of Franchisor.

        D.      At least 4 months prior to Commencing Construction, submit to Franchisor with a request for approval, prior to the preparation of the final building plans and specifications, the schematic design development documents for the building prepared by a registered architect or engineer in compliance with all applicable laws, regulations, ordinances, and Franchisor standards, which schematic design development documents, when approved by Franchisor, shall not thereafter be materially modified without the prior written consent of Franchisor.

        E.      At least 3 months prior to Commencing Construction, submit to Franchisor with a request for approval, after the schematic design development documents for the buildings have been approved by Franchisor, final building plans and specifications prepared by a registered architect or engineer in compliance with all applicable laws, regulations, ordinances and Franchisor standards which plans and specifications, when approved by Franchisor, shall not thereafter be materially modified without the prior written consent of Franchisor.

        F.      Provide to Franchisor satisfactory evidence that all permits, licenses, and certifications required for the lawful construction and operation of the proposed Property, including, without limitation, all applicable building permits, zoning access, sign and fire requirements, have been obtained.

        G.      Provide to Franchisor insurance certificates satisfying the applicable requirements set forth in Article 12 of this Agreement.

        H.      Provide to Franchisor evidence that Franchisee possesses or has obtained adequate financing for constructing, furnishing, and operating the Property.

        I.      Such other information as Franchisor may reasonably request.

    5.2    Commencement of Construction. Franchisee shall Commence Construction (i) within 365 days after the Effective Date, or (ii) within 60 days of the point in time when a building permit for the Property is ready for issuance, whichever occurs earlier. Notwithstanding the foregoing, if this Agreement is being entered into pursuant to a Development Agreement, Franchisee shall commence construction of the Property (i) within 90 days after the Effective Date, or (ii) within 60 days of the point in time when a building permit for the Property is ready for issuance, whichever occurs earlier. A building permit shall be deemed ready for issuance at the point in time when the issuing authority has taken all steps necessary for issuance, and would issue the building permit upon the payment of the fee therefor. In Franchisor's discretion, Franchisor may grant Franchisee up to four (4) 30-day extensions for a fee of $5,000 for each extension. Any such extensions shall be granted only in Franchisor's sole discretion and upon payment of such additional extension fees as Franchisor deems appropriate in its sole discretion. Franchisee shall pay Franchisor a fee of $5,000 at the time the extension is requested. If the extension is not granted, the fee will be refunded. Franchisee shall provide written notice to Franchisor of the date of Commencement of Construction within 5 days after it occurs. Once commenced, construction work shall continue uninterrupted (except for interruption by reason of events constituting force majeure) until it is completed.

        A.      Franchisee shall provide evidence of execution of contract for approved exterior signage with an approved vendor within thirty (30) days after Commencement of Construction.

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

B.    Franchisee shall submit to Franchisor, within sixty (60) days after the Commencement of Construction, any request for approval of any alternate FF&E products pursuant to Section 8.2. Unless alternate FF&E products are approved by Franchisor, Franchisee must use only such FF&E products that are specified by Franchisor in the Brand Standards and other documents containing FF&E specifications current at the Commencement of Construction. Notwithstanding the foregoing, upon request, Franchisor may, in its reasonable discretion, alter FF&E requirements for the Property due to local market conditions, custom or practice.

5.3    Construction Completion.  Franchisee shall diligently and continuously prosecute the construction, furnishing, and equipping of the Property (including its acquisition and installation of all FF&E, signs, supplies, and other items necessary for completion and opening of the Property) in accordance with the plans previously approved by Franchisor and in accordance with the Brand Standards, but in any event the construction, furnishing, and equipping of the Property shall be completed within 12 months after the date of Commencement of Construction. Franchisee acknowledges and understands that time is of the essence in the construction and opening of the Property, and except for the occurrence of any events constituting force majeure, the construction shall be completed and the Property shall be furnished, equipped, and otherwise be made ready to open for business, and all governmental licenses and permits (including a certificate of occupancy) necessary to operate the Property under the System shall have been obtained by Franchisee, at the end of such 12-month period ("Construction Completion"). Franchisor shall have the sole right to determine whether the construction work has been completed in accordance with this Agreement, the approved plans, and the Brand Standards. If Franchisee has met the requirements set forth in this Article 5 and has received a certificate of occupancy for a portion of the Property, Franchisee may open the Property for business. In Franchisor's discretion, Franchisor may allow Franchisee up to four (4) additional 30-day extensions of the construction completion date for a fee of $5,000 per extension. The fee for each extension shall be payable at the time Franchisee applies for the extension. If the extension is not granted, the fee will be refunded.  Any further extensions shall be granted only in Franchisor's sole discretion and upon payment of such additional extension fees as Franchisor deems appropriate in its sole discretion.

5.4    Right to Inspect.  Franchisee agrees that Franchisor and its agents shall have the right (without, however, any duty or obligation to do so) to inspect the construction of the Property at all reasonable times.

5.5    Compliance with Brand Standards.  Franchisor's exercise of its rights to approve the plans and specifications and to inspect construction of the Property shall be solely for the purpose of assuring compliance with Brand Standards, written approvals and with the terms and conditions of this Agreement, and Franchisor shall have no liability or obligation to Franchisee or any other person with respect to construction of the Property.

5.6    Pre-Opening.  No later than thirty (30) days prior to the expected Opening Franchisee shall:

A.    submit to Franchisor, for its prior approval, Franchisee's direct sales and marketing plan if requested to do so by Franchisor; and

B.    employ a qualified property manager for the Property.

5.7    Opening.  The Property shall be opened for business immediately upon satisfaction of all of the following requirements:

A.    All FF&E required for the opening of the Property in accordance with this Agreement and the standards of Franchisor shall have been installed or completed, and Franchisee shall

have submitted to Franchisor a certificate of occupancy from appropriate regulatory authorities. Franchisee may open on a floor by floor basis provided that all of the following requirements are satisfied as to all portions of the Property premises to which guests will have access: (i) all life and safety code requirements have been met; (ii) Franchisee has a certificate of occupancy or temporary certificate of occupancy for each floor opened, (iii) Franchisee has provided written documentation to Franchisor of such temporary certificate of occupancy, and (iv) Franchisee is proceeding diligently toward completion of the full Property facility in accordance with the terms of this Agreement.

        B.      Franchisee's property manager for the Property shall have completed to Franchisor's satisfaction a training program approved or conducted by Franchisor, and Franchisee shall have employed qualified personnel sufficient to operate the Property.

        C.      Franchisee shall have paid all sums due Franchisor and its affiliated companies.

        D.      Franchisee is not in default under this Agreement, or any existing franchise agreement or other agreement with Franchisor or any of its Affiliated companies.

        E.      Franchisee is in compliance with all requirements of the Americans with Disabilities Act and has provided proper evidence thereof to Franchisor.

        F.      Franchisor is satisfied as to Franchisee's compliance with requirements necessary for opening the Property by such on-site inspection and investigation as Franchisor deems appropriate, which shall be made and completed within 30 days of receipt of the certificate of occupancy, or temporary certificate of occupancy as the case may be, of Franchisee pursuant to this Agreement. If the Franchisee fails to pass its initial pre-opening inspection, Franchisor reserves the right to charge and collect a reasonable re-inspection fee and expenses for each additional inspection required to approve the Property for opening. The re-inspection fee and related expenses shall be due and payable within 30 days of receipt of an invoice therefor. Nothing under this Agreement shall in any manner relieve Franchisee of the obligation of complying with the requirements of the approved plans or the terms of this Agreement.

Franchisee may not open the Property until the above requirements have been satisfied to Franchisor's satisfaction.

      5.8     Cost. Franchisee acknowledges and understands that Franchisee shall bear the entire cost of the development and construction of the Property, including, without limitation, all costs applicable to design, engineering, and other professional services, contractors, financing, licenses, permits, equipment, furnishings, and supplies.

## Article 6     Duties of Franchisor.

      6.1     Franchisor's Obligations. Franchisor agrees as follows:

        A.      Franchisor shall provide to Franchisee a set of then-current prototype plans and specifications (not for construction) as determined by Franchisor for a typical System Property of the type specified in **Recital B** of this Agreement. These plans must be adapted to Franchisee's site by the appropriate licensed architects.

        B.      Upon reasonable request, Franchisor shall consult with and advise Franchisee at Franchisor's home office concerning the construction and operation of the Property. Any guidance, recommendations, or advice provided to Franchisee during such consultation shall be deemed suggestions

only, and the decision to follow any such guidance, recommendations, or advice will be made by Franchisee in Franchisee's sole discretion.

C.    Franchisor shall provide Franchisee access to the Brand Standards in a format determined by Franchisor, such as via the Intranet or in any such other way as Franchisor determines to be most appropriate, for the Term setting forth standards of operation for the System and standards of quality, cleanliness, and service for the Property. Franchisor shall have the right to add to and otherwise modify the Brand Standards to reflect changes in the business, authorized products or services (or specifications therefor), FF&E requirements, quality standards, and operating procedures of the Property as determined by Franchisor. Such additions or modifications may be made through various communications by Franchisor, including policy statements, memoranda, bulletins, directives, instructions, intranet, electronic communications, or other material prepared by or on behalf of Franchisor, and may impose a separate fee on Franchisee. The Brand Standards and any additions or modifications may be provided in printed, machine readable, electronic, or any other form chosen by Franchisor.

D.    Franchisor shall provide Franchisee with access to, and use of, the Property Management System and the Reservation System.

E.    Franchisor shall make available to Franchisee and Franchisee's employees such required and optional training courses, programs, conferences, seminars, and materials, as Franchisor deems appropriate. All training shall be conducted at such locations and at such times as Franchisor may designate and shall be subject to the terms and conditions set forth in this Agreement.

F.    Franchisor shall endeavor to maintain high standards of quality, cleanliness, appearance, and service for the System, and to that end shall conduct inspections of the System Properties, evaluations of the services rendered therein, and interviews of employees, agents, and customers of System Properties, all as Franchisor deems advisable and appropriate.

6.2    <u>Performance by Designee</u>. Franchisee acknowledges and agrees that any duty or obligation imposed on Franchisor by this Agreement may be performed by a designee, employee, or agent of Franchisor, as Franchisor may direct. Franchisee further acknowledges that Franchisor is the franchisor of multiple brands and does and may coordinate and combine functions such as reservations, sales, marketing, training, R&D, field staff and other functions between Choice Brand Hotels and not separate facilities, staff or other resources by brand.

6.3    <u>Duty to Franchisee Only</u>. All of the obligations of Franchisor under this Agreement are to Franchisee only, and no other party is entitled to rely on, enforce, or obtain relief for breach of such obligations either directly or by subrogation.

**Article 7    General Duties of Franchisee.**

In addition to the other obligations and duties set forth in this Agreement, Franchisee agrees as follows:

7.1    <u>Construction Completion</u>. Franchisee covenants and agrees to commence, diligently pursue, and complete construction of the Property and open for business in accordance with Article 5 of this Agreement, if applicable.

7.2    <u>Personnel; Training</u>. Franchisee shall employ or retain qualified management personnel as prescribed in the Brand Standards. All personnel employed or retained by Franchisee in the position of property or general manager shall attend and successfully complete, to Franchisor's satisfaction,

Franchisor's general manager training program and be certified by Franchisor. The initial property/general manager shall complete all online and class room parts of their training and the on Property training before the Property opens for business and shall complete the certification examination part of their initial training within 90 days of employment. Any replacement property/general manager must complete the entire initial training for property/general managers within 90 days of employment. The 90 day period may be extended if space in the training program is not available to Franchisee's personnel during the specified periods. Franchisor may from time to time revise the initial training that Franchisee and Franchisee's personnel are required to complete. Such changes may include who is required to complete initial training, when, where and how the initial training will be conducted and when it must be completed, as well as its scope and the fees charged for training. If the initial training program changes between the Effective Date and the time the Franchisee and its personnel are required to participate in and complete the initial training pursuant to Brand Standards, as amended after the Effective Date but before such persons have completed the initial training, the Franchisee and its personnel will be required to participate in, and complete, the initial training as amended.

    A.    Franchisor may periodically make available other required or optional training courses to Franchisee's personnel, other than those mentioned, as well as other programs, conferences, seminars, and materials, and Franchisee shall ensure that such personnel, as Franchisor may direct, satisfactorily complete any required training within the time specified.

    B.    All training shall be provided at such locations as Franchisor may designate and Franchisee shall be responsible for Franchisee's employees' travel expenses and room, board, and wages during the training. Franchisee will be charged reasonable tuition for training of Franchisee's personnel and such tuition shall be payable per the terms of the invoice therefor. Franchisor reserves the right to require, as a condition of providing training, that personnel employed or retained by Franchisee execute confidentiality agreements prepared by Franchisor. Franchisor reserves the right to limit the availability of any optional training programs. Franchisee understands and agrees that Franchisee is solely responsible for training franchisee's employees in the operation of the Property.

    7.3    <u>Annual Conference</u>. Franchisee, or if Franchisee is an entity, one or more of Franchisee's principal owners, shall attend Franchisor's annual (or biannual as Franchisor may determine) Franchisee conference and pay the non-refundable conference registration fee as the same may be designated by Franchisor. Franchisee will be charged the conference fee for one attendee to the Franchisor's annual conference even if the Franchisee does not send or register any attendees. The annual conference may be held as part of, or in connection with, brand conventions for one or more brands that Franchisor or its Affiliates control.

    7.4    <u>Compliance With System</u>. Franchisee expressly acknowledges that adherence to each and every provision of the System is reasonable, necessary, and essential to maintain the uniform image and favorable reputation of each Property and the System and the success of Franchisor's license program. Accordingly, Franchisee expressly agrees to comply with each and every requirement of the System during the term hereof, as the same may be modified or supplemented by Franchisor in its sole discretion. Such modifications and supplementations may relate to, without limitation, changes in the business, authorized products and services, FF&E requirements, quality standards, operating procedures, compliance with any requirements for installing frame relay, customer information systems, reservations systems and other systems or technology programs, and to pay any fees or charges associated with any such System modifications or supplementations and any other changes reflected in the Brand Standards.

    7.5    <u>Service Standard</u>. Franchisee shall provide efficient, courteous, and high-quality service to the public and shall operate the Property as outlined in the mandatory parts of the Brand Standards except as otherwise permitted by Franchisor in writing. Franchisee shall cause the Property to honor all

credit cards and other payment models specified by Franchisor and enter into such arrangements with the issuers of such cards and other payment methods as may be necessary to do so.

7.6     No Ancillary Businesses.   Franchisee shall use the Property premises solely for the operation of the Franchised Business and shall not use or allow the use of the premises for any other purpose or activity (including, without limitation, the promotion of any Competing Business) at any time without the prior written consent of Franchisor, which may be granted or withheld in Franchisor's sole discretion. Franchisee shall not sacrifice Gross Room Revenue to further any other business activity.

7.7     Cleanliness and Condition.   The Property and everything located on the Property premises shall be maintained by Franchisee in a clean, safe, orderly, and first-class condition in accordance with the standards specified in the Brand Standards, and consistent with the image of a clean, sanitary, attractive, safe, and efficiently operated value-oriented, extended-stay lodging accommodation. Franchisee is solely responsible for determining and addressing all safety concerns relating to the condition of the Property and surrounding areas. The Property shall be constructed, maintained, and operated in compliance with all applicable fire, safety, health, and sanitation laws, ordinances, and regulations, and Franchisee shall maintain the highest health standards and ratings applicable to the Property and otherwise maintain high moral and ethical standards at the Property.

7.8     Maintenance.   Franchisee shall perform such maintenance of the Property as is required by Franchisor to maintain the condition, appearance, and efficient operation of the Property, including, without limitation, (a) continuous and thorough cleaning and sanitation of the interior and exterior of the Property, (b) interior and exterior repair of the Property, (c) maintenance of equipment at peak performance, (d) replacement of worn out or obsolete improvements, fixtures, furnishings, equipment, computer systems, software, and signs with approved improvements, FF&E, computer systems, software, and signs, and (e) periodic painting and decorating. At Franchisor's request, Franchisee shall upgrade the Property within the time specified by Franchisor at Franchisee's expense to conform to the building decor appearance and presentation of Proprietary Marks and trade dress consistent with Franchisor's then-current public image, including, without limitation, such structural changes, remodeling, redecoration and modifications to existing improvements as may be deemed necessary by Franchisor, as long as those same upgrading requirements are consistent with Brand Standards and apply to a majority of System Properties operated by Franchisees or by Franchisor or its Affiliates. Except as described above, Franchisee shall make no additions, alterations, or replacements to the Property or anything located on the Property premises without the prior written consent of Franchisor.

7.9     Sleeping Rooms.    Franchisee acknowledges and agrees (a) that this license and Franchisee's right under this Agreement are granted for the number of Sleeping Rooms specified herein, and (b) that Franchisee shall not expand the number of Sleeping Rooms in the Property without the prior written consent of Franchisor.

7.10     Comply With All Laws.   Franchisee shall, at Franchisee's expense, comply with all federal, state, and local laws, rules, ordinances, and regulations, and shall timely obtain, and keep in force as required throughout the Term, any and all permits, certificates, licenses, and approvals necessary for the full and proper conduct of the Franchised Business.

7.11     Notice of Suit.   Franchisee shall notify Franchisor in writing within 5 days of the commencement of any action, suit, or proceeding, and of the issuance of any inquiry, subpoena, order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, arising out of, concerning, or which may affect the operation or financial condition of the Franchised Business, including, without limitation, any criminal action or proceeding brought by Franchisee against employees, customers, or other persons.

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

7.12    Taxes. Franchisee shall pay when due all taxes levied or assessed in connection with the possession, ownership, or operation of the Property and all taxes payable on royalties and other payments made to Franchisor or to any of the affiliated companies (excluding income taxes payable by Franchisor or any of its affiliated companies). In the event of any bona fide dispute respecting any tax assessed against Franchisee, the Property, any personal property located therein, or any payments due to Franchisor or any of its Affiliates, Franchisee may contest the validity or amount of the tax in accordance with procedures of the taxing authority; provided, however, that Franchisee shall act with all due diligence and shall in no event permit a tax sale or seizure against the Property or any equipment, goods, or property located therein, or any impoundment of payments due to Franchisor.

7.13    Timely Payment. Franchisee recognizes that Franchisee's failure or repeated delays in making prompt payment in accordance with the terms of any agreements, leases, invoices, or statements for purchase or lease of FF&E, inventories, supplies, travel agent services, or other goods and services will be detrimental to the reputation of Franchisee, Franchisor, and other System Franchisees. Franchisee shall timely pay when due all amounts owed by Franchisee in connection with the operation of the Property.

7.14    Property Management System. Franchisor may make available to System Properties a Property Management System, which Franchisor may change, modify, or replace at any time in its sole discretion. If required by Franchisor, Franchisee shall install, maintain, and use the automated Property Management System as developed and promulgated (in the Brand Standards or otherwise in writing) by Franchisor and agree to the then-current terms of use for such Property Management System. If required by Franchisor, Franchisee shall either reimburse Franchisor for Franchisee's equitable pro rata share of Franchisor's cost of developing and maintaining such software, including, without limitation, enhancements, additions, substitutions, or other modifications provided to the System by Franchisor, purchase or license such system, or otherwise pay such fee as Franchisor or its Affiliate may decide to charge for use of such property management or related system.

7.15    Franchisee Entity. If Franchisee is at any time a corporation, limited liability company, partnership or other business entity, Franchisee agrees and represents that:

A.    Franchisee has the authority to execute and deliver this Agreement and to perform its obligations thereunder and is duly organized or formed and validly existing in good standing under the laws of the state of its formation or organization.

B.    Franchisee's organizational documents or partnership agreement will at all times state that the issuance and transfer of the ownership interests of Franchisee are restricted by the terms and conditions of this Agreement, and all certificates and other documents representing an ownership interest in Franchisee will bear a legend referring to the restrictions of this Agreement in form and language satisfactory to Franchisor.

C.    **Schedule A** to this Agreement will at all times completely and accurately describe all of the owners of Franchisee and their beneficial ownership interests in Franchisee.

D.    Franchisee and its owners will sign and deliver to Franchisor such revised **Schedule A** as may be necessary to reflect any permitted changes in the information contained therein within 5 days following the occurrence thereof and to furnish such other information about Franchisee's organization or formation as Franchisor may request.

E.    Franchisee shall furnish Franchisor with its articles or certificate of incorporation, bylaws, and partnership or limited liability documentation or similar organization documents, and any other documents Franchisor may reasonably request, and any amendments thereto or restatements thereof.

7.16    Condemnation or Casualty. If the Property (or any of the premises on which the Property is located) is condemned or damaged by casualty, Franchisee agrees as follows:

A.    Franchisee shall, within 10 days of receipt, provide Franchisor with a copy of any notice of any proposed taking of the Property or surrounding premises by eminent domain or condemnation. Such notice shall be sent by Franchisee to Franchisor by overnight courier service. If the Property is condemned or so taken or such a substantial portion of the Property is condemned or so taken as to render impractical the continued operation of the Property in accordance with System standards, then in such event, (i) this Agreement shall terminate upon notice by Franchisor to Franchisee, and (ii) notwithstanding subsection (i), Franchisor shall be entitled to receive the payments due under Article 4 for as long as the Property remains open for business or for a period of 1 year from the date Franchisee notifies Franchisor of the condemnation, whichever is longer. If the Property ceases business operations prior to 1 year from the date Franchisor receives notice of the condemnation, Franchisor will be entitled to receive a payment from Franchisee for the balance of the one-year period based on the average monthly fees from the trailing 12 months, if such condemnation is due to the fault of Franchisee. If a non- substantial condemnation shall occur, then in such event, Franchisee shall promptly make whatever repairs and restoration may be necessary to make the Property conform substantially to its former character and appearance according to plans and specifications approved by Franchisor, and the resumption of normal operation of the Property shall not be unreasonably delayed by Franchisee.

B.    If the Property is damaged or destroyed by fire or other casualty, and the casualty requires closing the Property, Franchisee shall (i) immediately notify Franchisor whether it intends to rebuild or repair the Property or cease operations and terminate this Agreement if it is in the best interest of Franchisee, (ii) commence reconstruction and repair as soon as practicable, but in any event within 180 days after the closing of the Property if Franchisee intends to continue operations, (iii) repair or rebuild the Property in accordance with the then-current System standards and specifications, and (iv) reopen the Property for continuous operations under the System as soon as practicable, but in any event within 12 months after closing the Property, provided that the Property may reopen only after Franchisor's express written approval of the same for opening. Franchisee shall give Franchisor at least 90 days advance written notice of the date of such reopening. If Franchisee decides to terminate this Agreement pursuant to Article 7.18.B (i) Franchisee will not be subject to Liquidated Damages.

C.    The closing of the Property due to condemnation or casualty shall not extend the Term.

7.17    Customer Data. Franchisee acknowledges and agrees that, in addition to the rights granted Franchisor under Article 10.6 hereof, Franchisor may use the names of customers or guests of the Property for any purpose, and agrees that Franchisor may have access to Franchisee's sales and customer data base for that purpose.

7.18    Website. Franchisor has established an Internet Website that provides information about the System and that facilitates reservations for all System Properties. Franchisor will have sole discretion and control over its Website (including timing, design, contents and continuation). Franchisor may use part of the Marketing Fees it collects under Section 4.1C to pay or reimburse the costs associated with the development, maintenance and update of the Franchisor Website. At Franchisee's expense, Franchisor will include a link to the Property specific page from the Franchisor Website or a replicate. Franchisor shall have the only WoodSpring Suites Website. Franchisor may operate a Website for the WoodSpring Suites System combined with any other Affiliate System operated and franchised by Franchisor or its Affiliates. Franchisee may not have any individual Website other than those accessed and linked through Franchisor's primary Website. Franchisor may require Franchisee to prepare all or a portion of such individual pages, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to

Franchisor's prior written approval prior to posting. Except for this interior page, Franchisee may not maintain a Website or presence on a Website or on the Internet in connection with Franchisee's ownership or operation of the Property. Notwithstanding the foregoing sentence Franchisee is allowed to identify its interest in the Property on a Franchisee Website for no purpose other than to acknowledge its ownership in the Property. Because website technologies and their uses are constantly evolving, Franchisor reserves the right to require Franchisee's participation in other technologies being implemented as part of the System, such as social media and mobile applications and other mobile marketing technologies.

7.19    Internet Use. Franchisor reserves the right to require Franchisee to remove any video, advertising or other material or content posted on the internet or any website that Franchisor, in its reasonable discretion, deems inappropriate. Franchisor reserves the right to develop additional Websites and profiles or accounts on Websites designated for social networking, or on Websites otherwise commonly used by extended-stay industry or by the franchise industry in general. Franchisor may, in its sole discretion, require Franchisee to participate in such Websites by preparing and maintaining all or a portion of a profile or account for the Franchisee, at Franchisee's expense.

7.20    Intranet. Franchisor has developed an Intranet network through which confidential brand standards and other materials may be posted and where Franchisor and its Franchisees can communicate by e-mail or similar electronic means (the "Intranet"). Franchisee agrees to use the facilities of the Intranet in strict compliance with the standards, protocols and restrictions that Franchisor includes in the Brand Standards (including, without limitation, standards, protocols and restrictions relating to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements).

7.21    Association Dues. Franchisee shall pay the Franchisee Association's then-current dues, assessments, and conference fees to attend the Franchisee Association meetings, regardless of whether Franchisee attends such meetings.

7.22    Optional Assistance. If Franchisee requests and Franchisor or its Affiliates provide additional administrative services to Franchisee, including, but not limited to: assistance with closings of financing transactions or other transactions relating to the Property, negotiations of comfort letters, non-disturbance agreements, and other instruments, documents and agreements with Franchisee's lenders or prospective lenders, lender's counsel, Franchisee's counsel, any other Franchisee representative, or third party; conducting research related to the Property and its operation; preparation of documents, instruments or agreements; and other project-based tasks, Franchisee agrees to pay to Franchisor a reasonable fee, as determined by Franchisor, for such services and to reimburse Franchisor and its Affiliates for any costs (including attorney's fees) incurred in connection with the provision of such services.

7.23    Legal Actions. Franchisee shall reimburse Franchisor for all costs and expenses (including attorneys' fees), incurred by Franchisor in connection with any legal action (including actions for injunctive relief, arbitration and mediation) in which Franchisee, its Affiliates, or their respective owners, directors, officers or managers is a named party, including but not limited to, reimbursement for costs and expenses incurred in connection with Franchisor's counsel entering an appearance, responding to discovery requests in such matters, and preparation by Franchisor and its counsel therefor.

7.24    System Programs. Franchisee shall participate in all joint programs developed by Franchisor and its Affiliates for the System and any Affiliate Systems, including guest loyalty programs, gift card programs and marketing programs. Such participation does not render Franchisee a franchisee of any Affiliate System.

7.25    Anti-Terrorism Laws. Franchisee and its owners understand the requirements of, and will abide by, all United States government economic sanctions requirements. Franchisee represents and warrants that neither it nor any of its direct or indirect owners, directors, officers, employees or agents is a person subject to trade restrictions under United States law, including (without limitation) the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., or any Executive Orders or regulations promulgated thereunder (including Executive Order 13224 of September 24, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, and the Specially Designated Nationals and Blocked Persons List) ("Anti-Terrorism Laws"). Franchisee and its owners may not engage in any activity that would expose Franchisor or its Affiliates to a risk of criminal or civil penalties under applicable United States law. Any violation of the Anti-Terrorism Laws by Franchisee or its owners, or any blocking of Franchisee's or its owners' assets under the Anti-Terrorism Laws, shall constitute good cause for immediate termination of this Agreement.

7.26    Anti-Bribery Laws. Franchisee and its owner understand the requirements of, and will abide by, all other United States laws that address foreign business activities of United States citizens or individuals and businesses that operate, in whole or in part, in the United States, including but not limited to the Foreign Corrupt Practices Act (the "FCPA"), which prohibits, in pertinent part, companies subject to the FCPA from providing anything of value to a foreign official for purposes of obtaining or retaining business or a competitive advantage and which further requires an entity that issues stock registered in the United States or which is required to file periodic reports with the U.S. Securities and Exchange Commission to maintain internal accounting controls and designated books and records related to compliance therewith. Any violation of the FCPA or other United States laws by Franchisee or its owners, employees or agents shall constitute good cause for immediate termination of this Agreement.

**Article 8    Quality Control and Supervision.**

8.1    Maintaining System Standards. Franchisee agrees that substantial uniformity of quality at all System Properties is necessary and desirable for purposes of establishing and protecting the shared identity, reputation, and goodwill associated with the System and the Proprietary Marks. In order to better accomplish these objectives, Franchisee agrees that:

A.    The Property shall be operated in strict conformity with such mandatory standards, specifications, methods, and techniques (as opposed to any best practices and other optional advice that may be included in the Brand Standards) as Franchisor may, prescribe in the Brand Standards, and Franchisee shall refrain from deviating therefrom and from otherwise operating in any manner which adversely reflects on the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's rights therein. Notwithstanding the foregoing, Franchisor is not entitled to exert control over Franchisee's employee's working conditions, except to the extent of controlling the quality of the System/brand and the quality of the products and services that Franchisee offers.

B.    Franchisee shall, at Franchisee's expense, purchase or lease and install at the Property all FF&E, Property Management System, frame relay, customer information system, Reservation System, and other systems and technology programs specified by Franchisor. Franchisee shall refrain from installing in, on or about the Property, or permitting to be installed, without Franchisor's prior written consent, any FF&E, electronic or video games or any other items or services not previously approved by Franchisor. The size, form, color scheme, content (except for prices, charges or other rate information which are subject to Section 8.8 below), and location of all signs, advertisements and graphic materials displayed in any public area or Sleeping Rooms at the Property shall be as prescribed in the Brand Standards or otherwise approved in writing by Franchisor.

WS Multistate 2/2018
                                                    (Franchise Agreement - Ex. C)

       C.     All products and services sold or offered for sale at the Property, and other products, materials, supplies, paper goods, fixtures, furnishings and equipment used at the Property, must meet our standards and specifications. Franchisee must also purchase all products and services that Franchisor designates in the Brand Standards solely from suppliers (including manufacturers, distributors and other sources) approved by Franchisor (collectively, "Qualified Vendors"), which demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's standards and specifications, who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably, and who have been approved by Franchisor in writing. Franchisor reserves the right to require Franchisee to purchase any or all approved products or services solely from Franchisor or its designated Affiliate. Franchisor also reserves the right to receive a rebate or other benefit from Qualified Vendors based on purchases by Franchisee and other franchisees. Franchisor may limit the number of Qualified Vendors to obtain volume discounts and to promote consistent quality and adequate supplies for the brand.

       8.2    Alternate Products and Services. If Franchisee desires to purchase designated products or services from a party other than a Qualified Vendor, Franchisee must submit to Franchisor a written request to approve the proposed supplier, together with such information as Franchisor may reasonably require. Among the criteria that Franchisor may consider is the financial stability of the supplier, whether the product or service meets Franchisor's standards and specifications, and whether the product or service is of use to Franchisor's franchisees. Franchisor's complete written criteria are available for review upon your request. Where applicable, the proposed supplier must submit product samples and specifications to Franchisor. Franchisor will use its best efforts to notify the proposed supplier within 90 days after Franchisor receives all required information and samples, although a longer period may be required for certain products or services due to their cost or importance to the brand or their financial impact on Franchisor's franchisees. Franchisor may revoke its approval of particular products or Qualified Vendors when Franchisor determines, in its sole discretion, that such products or suppliers no longer meet Franchisor's standards or specifications.

       8.3    Brand Standards. The Franchised Business shall be conducted in accordance with the Brand Standards, as updated, supplemented, and modified. Franchisee further acknowledges that establishing, maintaining, and protecting the goodwill, reputation, and uniformity of the System requires strict adherence to this Agreement and the Brand Standards in all respects, it being agreed that every detail is significant and material. If Brand Standards are maintained in hard copy or in another format which is not automatically updated (i.e. such as a copy maintained on the Intranet) Franchisee shall at all times ensure that Franchisee's copy of the Brand Standards is kept current and up-to-date, and in the event of any dispute as to the contents of the Brand Standards, the terms of the master copy of the Brand Standards maintained by Franchisor at Franchisor's home office shall be controlling. Franchisee shall maintain the Brand Standards in a safe and secure location and shall report the theft or loss of the Brand Standards, or any portion thereof, immediately to Franchisor.

       8.4    Inspections. Franchisee hereby grants to Franchisor and its agents the right to enter upon the premises of the Property at any reasonable time for the purpose of conducting inspections. Franchisee shall (a) provide lodging without charge to Franchisor's agent during such time as may reasonably be necessary to complete such inspections; (b) cooperate fully with Franchisor's agents during the inspections; and (c) take such steps as may be reasonably necessary to correct any deficiencies detected during such an inspection, upon the written request of Franchisor or its agents, within such reasonable time as may be specified therein. Franchisee shall provide all information requested by Franchisor for the purpose of Franchisor's conducting guest satisfaction audits and surveys. Franchisee agrees that Franchisor may evaluate Franchisee's compliance with this Agreement, the Brand Standards, and any quality assurance program Franchisor administers, remotely and/or through data obtained from guest satisfaction surveys or programs. If Franchisee fails an inspection or fails to meet brand standards, Franchisor will charge Franchisee its then-current quality assurance fine. If, upon re-inspection the failure has not been remedied,

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

Franchisee may be charged an additional fine. Franchisee must also pay the reasonable expenses of Franchisor's representative(s) conducting any such inspections. Franchisee shall pay such fine as may be charged pursuant to this Section and expenses within 15 days of receipt of an invoice therefor.

8.5    Public Health and Safety. If Franchisee fails an inspection for any health or safety reason that Franchisor, in its reasonable discretion, deems to constitute a danger to the health or safety of the public, employees at the Property, or guests or visitors to the Property, Franchisee shall, immediately upon Franchisor's request, take such action as reasonably required by Franchisor, including closing all or part of the Property, or not allowing any new guests, until the dangerous conditions have been remedied to Franchisor's satisfaction. Nothing in this Section 8.5 shall limit or restrict Franchisor's rights under Article 14, or any other Article of this Agreement.

8.6    Property Improvement Review. If the Property has sustained substantial wear and tear Franchisee may request, or Franchisor may require, that a property improvement review ("PIR") be performed. The PIR will identify areas of the Property or items that do not satisfy then current System standards as set forth in the Brand Standards, and identify steps required to be taken to remedy identified deficiencies. Franchisee will pay Franchisor the then current fee for performing the PIR. The fee will be payable upon request for the PIR to be performed.

8.7    Franchisee Improvements. If Franchisee develops any designs, products, services, procedures, or inventions deemed by Franchisor to be appropriate for use in other System Properties or any Affiliate System, it is understood and agreed that Franchisor shall be the owner of such designs, products, services, procedures, or inventions without obligation to compensate Franchisee, it being understood and agreed that the benefit to the Franchisee from the overall enhancement of the System is sufficient consideration for granting this right to Franchisor, however Franchisee will be granted a license to use such designs, products, services, procedures, or inventions.

8.8    Standard of Conduct. All marketing and promotion by Franchisee shall be factual, ethical, and in good taste in the judgment of Franchisor and shall be subject to Franchisor's approval as provided in Section 9.1 of this Agreement. Franchisee shall in all dealings with its customers, suppliers, Franchisor, and the public adhere to the highest standards of honesty, integrity, fair dealing, and ethical conduct. Franchisee agrees to refrain from any business or advertising practice which, in the subjective opinion of Franchisor, may be injurious to the business of Franchisor and the goodwill associated with the Proprietary Marks and other System Properties.

8.9    Notice of Violations. Immediately upon receipt by Franchisee of any report from any health department or other comparable agency, Franchisee shall send a complete copy of such report to Franchisor by overnight courier service. Franchisee shall notify Franchisor in writing within 5 days of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of Franchisee or the Property or of any notice of violation of any law, ordinance, or regulation relating to health or sanitation.

8.10    Rate Recommendations. Franchisor and Franchisee recognize the value of pricing and marketing programs that facilitate the marketing of the System, the good will, reputation, and uniformity of the System and consumer acceptance and recognition of System Properties. Franchisee and Franchisor agree that, in order to better accomplish these objectives, Franchisor may from time to time in its sole judgment recommend (but not require) (a) that rates for lodging accommodations shall start at levels no higher than those determined by Franchisor, (b) mandatory maximum charges for the goods and services offered by the Franchisee at the Property, (c) Franchisees offer some Sleeping Rooms in the Property at specified maximum prices, and (d) other rates and prices to the extent permitted by applicable law.

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

**Article 9     Marketing and Reservations.**

Franchisee and Franchisor recognize the value of advertising and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System and Affiliate Systems. In order to better accomplish these objectives, the parties agree as follows:

9.1     <u>Marketing Standards</u>. All advertising, marketing, and sales materials used by Franchisee in any medium shall be conducted in such manner, and shall conform to such standards and requirements, as Franchisor may specify from time to time. Franchisee must submit to Franchisor for its prior written approval samples of all advertising, marketing, and sales plans and materials and all other materials displaying the Proprietary Marks that Franchisee desires to use which have not been prepared or previously approved by Franchisor; provided, however, that no such deemed approval shall relieve Franchisee from complying with the requirements of Section 8.7 of this Agreement.

9.2     <u>Directories</u>. Franchisee shall obtain listings at Franchisee's expense in the yellow and white pages of local telephone directories and maintain and participate in such social media activities and maintain such an internet presence as Franchisor may specify from time to time.

9.3     <u>Marketing Fund</u>. Franchisor has established a Marketing, Branding, Sales and Advertising Fund ("Marketing Fund") funded solely by Marketing Fees paid by System Franchisees. The Marketing Fund is administered by Franchisor in its sole discretion for the benefit of the System and the Affiliate Systems. The Marketing Fund will be used to meet any and all costs of researching, developing and preparing national, regional, point of sale, and local direct sales advertising and marketing strategy materials for use by Choice Brand Hotels, including, without limitation, costs associated with developing, preparing, directing, administering, maintaining, and disseminating advertising, marketing, promotional, and public relations materials; conducting marketing research; maintaining a national sales and marketing staff and related expenses; development, maintenance and updates to the Choice Websites; joint promotional programs for all Choice Brand Hotels; and preparing, producing, broadcasting, and disseminating advertising and promotions, including, without limitation, radio, television, newspaper, magazine and Internet advertising, market surveys, public relations activities, and employment of advertising agencies. Franchisor shall choose and determine the nature, theme, and timing of advertising and the kind and quality of advertising materials to be provided to Franchisees through the Marketing Fund. All payments, plus income earned therefrom, shall be used exclusively for the above-stated purposes, and shall not be used to defray any of Franchisor's general operating expenses, except for reasonable salaries, administrative costs, travel expenses, overhead, and similar expenses Franchisor may incur in activities related to the administration of the Marketing Fund and all costs of development and preparing national, regional, point of sale, and local advertising materials for use within the System and/or Affiliate Systems. Franchisor or its designee shall direct all advertising, marketing, and direct sales promotional programs and activities, with sole discretion over the concepts, materials, and media used in such programs and activities and the placement and allocation thereof. Franchisee acknowledges that the intent of the Marketing Fund shall be to maximize general public recognition, direct sales programs, and acceptance of the Proprietary Marks for the benefit of the System, Affiliate Systems, and other Choice Brand Hotels, and Franchisor or its designee shall have no obligation in administering the Marketing Fund, to make expenditures for Franchisee which are equivalent or proportionate to any payments by Franchisee, or to ensure that any particular Franchisee or any particular franchised location benefits directly or pro rata from advertising or promotion conducted under the Marketing Fund. The Marketing Fund is not a trust or escrow account, and Franchisor has no fiduciary obligation to franchisees with respect to the Marketing Fund; provided, however, that Franchisor will make a good faith effort to expend such fees in a manner that Franchisor determines is in the general best interests of the Choice Systems. Franchisor has the right to advance monies to the Marketing Fund and subsequently obtain reimbursement of such advances out of Marketing Fund fees collected. Franchisor has the right to divide the Marketing Fund into two or more funds, or to combine the Marketing Fund with

similar funds maintained for the benefit of all or a portion of an Affiliate System. If Franchisor divides or combines the Marketing Fund, Franchisee will pay its Marketing Fee to such fund as directed by Franchisor. The Marketing Fund will be accounted for separately from Franchisor's other funds, but its funds may be deposited in any of Franchisor's general accounts and commingled with Franchisor's other funds, including marketing funds of other Choice Brand Hotels. Franchisor shall not be obligated to credit the Marketing Fund with interest.

9.4    <u>Franchisee Association</u>. Franchisee and all Franchisees of the System shall be members of the Franchisee Association. As long as this Agreement remains effective, Franchisee shall be a member of the Franchisee Association or such successor association or franchise advisory council as may be designated by Franchisor to serve as an advisory council to Franchisor with respect to advertising, marketing, reservations, and other matters relating to System Properties. All Franchisees of the System and Franchisor shall be members of the Franchisee Association. As a member of the Franchisee Association, Franchisee shall pay to the Franchisee Association all dues, assessments, and conference fees authorized by the Franchisee Association and shall otherwise maintain its membership in the Franchisee Association in good standing ("good standing" means the Franchisee Association dues and assessments are current and Franchisee has not been given a notice of its default under this Agreement). Such fees shall be consistently applied to all Franchisees in the System and Properties owned by Franchisor or its Affiliates. The Franchisee Association shall be governed by the Bylaws of the Franchisee Association.

9.5    <u>Property Management System and Reservation System</u>. At Franchisor's sole option, Franchisee shall use the Property Management System (and the equipment, networks, software and procedures, including hardware and software refresh requirements, that are described in the Brand Standards Rules and Regulations) to operate and manage the Property and in connection with all guest transactions (including all transactions relating to the Sleeping Rooms), and use the Reservation System to accept, hold, honor and track all reservations for the Sleeping Rooms. Franchisee shall not use any other property management system or reservation system without Franchisor's prior written consent, which may withhold in Franchisor's sole discretion. Franchisee understands and agrees that its use of the Property Management System is governed by a separate agreement, as Franchisor may modify and/or update from time to time ("Online Terms of Use"), which Online Terms of Use are expressly incorporated herein by reference and made a part of this Agreement, and Franchisee agrees that it will abide by such Online Terms of Use and pay all applicable fees described in the Brand Standards. Franchisee also acknowledges and agrees that Franchisor and Franchisee each have ownership rights in data used or generated by the Property Management System and/or the Reservation System.

9.6    <u>Equipment and Software</u>. Franchisee shall purchase, install, and maintain at the Property all equipment necessary for participation in, and use of, the Property Management System and Reservation System as required by Franchisor, including a reservation terminal and related equipment and software and any future enhancements, additions, substitutions, or other modifications specified by Franchisor in the Brand Standards or otherwise in writing. Franchisee shall also be responsible for telephone line, internet connection, or other communication infrastructure charges for connecting Franchisee's reservation equipment to the Reservation System and for the cost of supplies used in the operation of the equipment and for all other related expenses.

9.7    <u>Rates</u>. Franchisee agrees to list the Property in the Reservation System and to furnish to Franchisor such information as Franchisor or its designee may request for that purpose. Franchisee understands and acknowledges that the success and utility of the Reservation System may require that it contain information concerning rates for lodging accommodations; that Franchisee shall have sole discretion in determining any rates for the Property which appears in the Reservation System; and that Franchisor assumes no liability for, nor shall Franchisor be deemed liable by reason of, any failure by Franchisee or Franchisor's other franchisees to honor any Reservation System rates for the period during

which the Reservation System is in effect. If rates are required to be included in the Reservation System listing for the Property, seasonal and other rate changes or differentials shall be specified, upon Franchisee's request. Franchisee agrees not to charge higher rates than those that Franchisee causes to be published in the Reservation System and to comply with such other requirements with respect to the Reservation System as may be specified in the Brand Standards.

**Article 10    Financial Reporting.**

10.1    Books and Records. Franchisee shall, in the manner and form specified by Franchisor in the Brand Standards or otherwise in writing, prepare on a current basis (and preserve for at least 5 years from the date of preparation) complete and accurate books and records in accordance with generally accepted accounting principles concerning Gross Room Revenue and all financial, operating, marketing, and other aspects of the Property and the Franchised Business, and maintain an accounting system that fully and accurately reflects all financial aspects of the Property, the Franchised Business, and Franchisee. Such books and records shall include, but not be limited to, books of account, tax returns, governmental reports, register tapes, daily and other periodic reports, and complete quarterly and annual financial statements (profit and loss statements, balance sheets, and cash flow statements). Franchisee's obligation to preserve such books and records shall survive the termination or expiration of this Agreement.

10.2    Profit and Loss Statement. On or before the 5th day of each calendar month, Franchisee shall submit to Franchisor a statement (in such form and detail as Franchisor may require) reflecting the computation of all amounts then due under Section 4.1 of this Agreement, provided that, if fees will become due under this Agreement more frequently than monthly, upon notice to Franchisee, Franchisor may require reports to be submitted more frequently. The statement shall include information for the preceding month as to Gross Room Revenue, other revenues, expenses, occupancy and room rates data, reservation data, and such other information as Franchisor may require. Any report required to be submitted hereunder not actually received by Franchisor on or before the date the related payment was due shall be deemed overdue unless postmarked at least 5 days prior to the date it was due.

10.3    Financial Statements. Franchisee shall submit to Franchisor as soon as available but not later than 90 days after the end of Franchisee's fiscal year, at Franchisee's expense, a full and complete reviewed financial statement in writing setting forth the Gross Room Revenue and the computation of all amounts paid by Franchisee under Section 4.1 of this Agreement for such fiscal year. Such statement shall be prepared in accordance with generally accepted accounting principles, consistently applied, and shall be accompanied by a report from an independent certified public accountant reasonably satisfactory to Franchisor that the statement has been examined in accordance with generally accepted auditing standards. In addition, at Franchisor's request, Franchisee shall submit to Franchisor true copies of all state sales tax returns and similar property specific returns relating to sales made at the Property at the same time the returns are filed with state authorities, and such other records as Franchisor may reasonably request, including, without limitation, state and federal income tax returns of Franchisee.

10.4    Audits. Franchisor or its representatives, at Franchisor's expense, shall at all reasonable times have the right to inspect or audit the books, accounts, records, returns, and statements of Franchisee. The foregoing records may include, but are not limited to, state and federal income tax returns, credit card or any other third party charge account statements, and any bank, savings and loan, brokerage, or other financial checking, money market, or savings account used for the Franchised Business. Franchisee shall fully cooperate with Franchisor and its representatives or agents conducting such inspections or audits and, upon request, Franchisee shall submit a written response to any issues raised in connection with said audits. In the event a discrepancy between reported Gross Room Revenue and actual Gross Room Revenue is uncovered in any audit conducted pursuant to this Article for any reporting period (monthly, quarterly, or annually), Franchisee shall promptly pay the amount determined to be owing and, if the discrepancy

23

exceeds 5% of reported Gross Room Revenue, Franchisee shall reimburse Franchisor for all costs of the audit, including travel, lodging, and wages of personnel of Franchisor or third parties required to conduct such audit. Franchisee shall also promptly reimburse Franchisor for the cost of any audit (including salaries, travel, and living expenses) necessitated by Franchisee's failure to file any financial report due hereunder and any deficiency in royalties or Marketing Fund contributions disclosed by such audit. At Franchisor's option, Franchisee shall also immediately pay to Franchisor a late charge on the understated amount due from the date such amount was due until paid at the lesser of 1.5% per month or the maximum rate permitted by applicable law. The foregoing remedies shall be in addition to any other remedies Franchisor may have. Submission by Franchisee of more than 2 written statements of Gross Room Revenue which under-report Gross Room Revenue for any reporting period by 5% or more (regardless of any subsequent cure) shall constitute a material breach of this Agreement entitling Franchisor, at its option, the right to terminate this Agreement pursuant to Section 14.1C of this Agreement.

10.5    Disclosure of Financial Information. Franchisee hereby authorizes all banks and/or other financial institutions with which Franchisee does business to disclose to Franchisor any requested financial information in their possession relating to the Property. Franchisee further authorizes Franchisor to disclose such information to prospective Franchisees and state regulatory agencies; provided that such information is not identified as relating to the Property unless required by law or regulation and then only if Franchisor requests that such identification be held in confidence.

10.6    Disclosure of Operations Data. The Franchisee agrees that Franchisor or its Affiliates may disclose to third parties data concerning and relating, directly or indirectly, to the Franchisee, the operations of Franchisee, and Franchisee's customers, including, but not limited to information about occupancy rates ("Operations Data"). Franchisee waives any notice in connection with the disclosure of Operations Data. Franchisor agrees, that it, or its Affiliates, will from time to time disclose to the Franchisee such operations data as it deems appropriate regarding other Franchisees of Franchisor (Operations Data jointly with operations data of other Franchisees, "System Operations Data"). The Company may, in its sole discretion, determine when and what System Operations Data will be disclosed, and may, without prior notice to, or consent from Franchisee, change the scope of the Systems Operations Data being disclosed to Franchisee or when it is disclosed. Systems Operations Data disclosed to Franchisee is disclosed solely for Franchisee's internal business purposes and to enable Franchisee to compare its results with those of other Franchisees of Franchisor. If Franchisor or its Affiliates operate multiple brands, Franchisee agrees that Franchisor or its Affiliates may disclose System Operations Data to each other and to franchisees of such other brands. The disclosed Operations Data and Systems Operations Data remains confidential information of Franchisor. Franchisee may not disclose Systems Operations Data to other Franchisees of Franchisor, prospective Franchisees of Franchisor, competitors of Franchisor, prospective purchasers of Franchisee or any of the Franchisee's assets, financial institutions, or any other third parties. The Systems Operations Data so disclosed will be based on information provided to Franchisor by its Franchisees. Such information will not be verified by Franchisor or any of its affiliates. Franchisor has no obligation to correct Systems Operations Data disclosed after it learns that it was incorrect or incomplete, or to inform Franchisee thereof.

## Article 11    Proprietary Marks and Trade Secrets; Competition.

11.1    No Ownership Rights. Franchisee acknowledges that ownership of all right, title, and interest in the System and all parts thereof, including, without limitation, the Proprietary Marks and the design, decor, and image of all System Properties, is and shall remain vested solely in Franchisor. Franchisee expressly disclaims any right, title, or interest therein or in any goodwill derived therefrom. Franchisee's license to use the System, and any part thereof, is personal to Franchisee, and Franchisee shall not license, sublicense, or allow the System, or any part thereof, to be used by any other person, firm, or

business association without Franchisor's prior written approval. All uses of the System by Franchisee inure to the benefit of Franchisor.

11.2    No Impairment. Franchisee shall not, directly or indirectly, at any time during the Term or thereafter, do, cause, or suffer to be done any act or thing disputing, attacking, or in any way impairing or tending to impair the right, title, or interest of Franchisor in the Proprietary Marks or the System. Franchisee shall immediately notify Franchisor in writing of all infringements or imitations of the Proprietary Marks of which Franchisee becomes aware, and Franchisor shall exercise absolute discretion in deciding what action, if any, should be taken. Franchisee shall fully cooperate with Franchisor in the prosecution of any action to prevent the infringement, imitation, or illegal use of the Proprietary Marks and agrees to be named as a party in any such action at Franchisor's request. Franchisor shall bear any and all legal expenses incident to Franchisee's participation, at Franchisor's request, in any action to prevent the infringement or illegal use of the Proprietary Marks, except for the cost of any legal counsel separately retained by Franchisee. Except as expressly provided in this Article, Franchisor shall not be liable to Franchisee for any damages, costs, expenses, loss of profits or business opportunities, or incidental or consequential damages of any kind or nature whatsoever relating to any action involving the Proprietary Marks.

11.3    Limited Use. Franchisee shall use the Proprietary Marks as the sole identification of the Property; provided, however, that in all public records and in its relationship with other persons, on stationery, business forms, checks, or as otherwise required by Franchisor, Franchisee shall indicate Franchisee's independent ownership of the Property. Franchisee shall identify the Property as being independently operated, such as "Independently owned and operated by [Franchisee] through a Franchise Agreement with Choice Hotels International, Inc." or "This WoodSpring Suites Property is independently owned and operated by [Franchisee] through a Franchise Agreement with Choice Hotels International, Inc." Franchisee shall file so-called assumed name or doing business certificates with local or state authorities, as required by applicable law, showing its independent ownership of the Property. In no event shall Franchisee use the Proprietary Marks in connection with the sale of any product or service not authorized for sale at the Property. Franchisee shall not license, sublicense, or allow the Proprietary Marks to be used by any other person or business entity without Franchisor's prior written approval. In adopting any corporate, proprietorship, or partnership name, Franchisee shall not use the Proprietary Marks or any variation or abbreviation thereof, or any words confusingly similar thereto. Franchisee has no right to register any of the Proprietary Marks. If it becomes advisable at any time in Franchisor's sole discretion for Franchisor and/or Franchisee to modify or discontinue use of the Proprietary Marks, and/or use one or more additional or substitute trade or service Proprietary Marks, Franchisee agrees to comply therewith within a reasonable time after written notice thereof by Franchisor.

11.4    Acknowledgments. Franchisee further acknowledges and agrees as follows:

A.    Franchisor possesses certain Trade Secrets, and in general, methods, techniques, formats, specifications, programs, procedures, information systems, and knowledge, in the operation and franchising of Properties and other lodging concepts.

B.    All confidential information it receives from Franchisor, its affiliates, or Franchisees is confidential and proprietary information in which Franchisor has a proprietary interest. For purposes of this Agreement, "Confidential Information" may include, by way of example, but without limitation, Trade Secrets, standard plans for the Property, Brand Standards, data, know-how, processes, designs, sketches, photographs, plans, drawings, specifications, reports, financial information, customer lists, pricing information, studies, findings, inventions, and ideas. Franchisee shall at all times preserve in confidence any and all Confidential Information, and Franchisee shall disclose such information or materials only to such of its employees or agents who must have access to it in connection with their

employment and the operation of the Property. Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, record, or otherwise reproduce the materials or information, in whole or in part, nor otherwise make the same available to any unauthorized person and may only use Confidential Information for the purpose of operating the Property.

        C.     Franchisee shall acquire no interest in the Trade Secrets, other than the right to utilize them in the development and operation of the Property during the Term. The use or duplication of the Trade Secrets in any other business will constitute an unfair method of competition. The Trade Secrets are proprietary and are disclosed to Franchisee in confidence and solely on the condition that Franchisee agrees, and Franchisee hereby agrees that Franchisee (i) will not use the Trade Secrets in any other business or capacity; (ii) will maintain the absolute confidentiality of the Trade Secrets during and after the Term; (iii) will not make unauthorized copies of any portions of the Trade Secrets disclosed in written form, including, without limitation, any plans, the Brand Standards, bulletins or supplements, and additions thereto; and (iv) will operate and implement all reasonable procedures prescribed by Franchisor to prevent the unauthorized use and disclosure of the Trade Secrets. Franchisee shall immediately notify Franchisor of any unauthorized use of disclosure of the Brand Standards or any of the Trade Secrets or if the Brand Standards or any other materials containing any Trade Secrets are lost or stolen.

        D.     The foregoing restrictions on Franchisee's disclosure and use of Trade Secrets shall not apply to information, processes, or techniques that are or become generally known and used by other similar hotels or lodging concepts, other than through disclosure (whether deliberate or inadvertent) by Franchisee, and disclosure of Trade Secrets in judicial or administrative proceedings to the extent that Franchisee is legally compelled to disclose such information, provided, Franchisee shall have used Franchisee's best efforts, and shall have afforded Franchisor the opportunity, to obtain an appropriate protective order or other assurance satisfactory to Franchisor of confidential treatment for the information required to be so disclosed. Trade Secrets will not be considered generally known or used by Franchisor's disclosure of such information to franchisees or Affiliates operating or owning properties operated under a different Choice Mark.

        11.5     <u>Ownership</u>. Unless the context otherwise requires, the term "Franchisee" as used in this Article 11 shall include, individually and collectively, all partners, officers, directors, and managers of Franchisee, and owners or holders, directly or indirectly (and any partners, officers, directors, and managers of any such holder), of 5% or more of the beneficial interest in Franchisee.

        11.6     <u>Confidentiality Agreements</u>. At Franchisor's request, Franchisee shall require and obtain execution of a confidentiality agreement in a form acceptable to Franchisor, (including a confidentiality agreement applicable upon the termination of a person's relationship with Franchisee) from any or all of the following persons: (a) all officers, directors, and holders of a beneficial interest of 5% or more of the securities of (i) Franchisee and (ii) any corporation directly or indirectly controlling Franchisee, if Franchisee is a corporation; (b) the general partners and any limited partners (including any corporation or other entity, and the officers, directors, and holders of a beneficial interest of 5% or more of the securities of such corporation or other entity which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership; and (c) the managers and members (including any corporation or other entity, and the officers, directors, and holders of a beneficial interest of 5% or more of the securities of any corporation or other entity which controls, directly or indirectly, any member or manager), if Franchisee is a limited liability company. Failure by Franchisee to obtain execution of the confidentiality agreement required by this Article, or to deliver such confidentiality agreement to Franchisor, shall constitute a material breach of this Agreement.

        11.7     <u>General Manager</u>. Franchisee shall require every person employed as the general manager of the Property to devote full time to such employment and for any property manager to agree in writing to

be bound by the restrictions set forth in this Article. Franchisee shall also take all reasonable steps to require other employees to be bound by the confidentiality provisions of this Article. Upon Franchisor's request, Franchisee shall promptly provide copies of all such agreements to Franchisor.

     11.8    <u>Electronic Use of Marks</u>. All use of the Proprietary Marks in electronic commerce, which includes all forms of electronic or computer communication, must comply with the requirements set forth in the Brand Standards. Franchisor may require that various types of marketing or advertising utilize a specific template or format. Franchisee must provide Franchisor with copies of all proposed applications for registrations of any of the Proprietary Marks or any variation thereof for use in and for electronic commerce, including Franchisee's Internet or Website address and domain name. Franchisee must obtain Franchisor's prior written approval to file any such application, which Franchisor may withhold in its sole discretion. Upon expiration or termination of this Agreement, Franchisee agrees to transfer its Internet or Website addresses and domain names to Franchisor upon Franchisor's written request. Franchisee will not receive any compensation for such transfer.

     11.9    <u>Judicial Proceedings</u>. In the event any provision of this Article is deemed by a court of competent jurisdiction to be more restrictive than permissible at law or equity, then Franchisee agrees that the provisions hereof may be reformed and modified and enforced by such court to the maximum extent permissible under applicable law and principles of equity. Franchisee agrees that specific performance and injunctive relief are necessary and appropriate remedies for violations of this Article and agrees to the enforcement of such remedies, but without prejudice to the right of Franchisor to recover money damages, which are in no event a full and adequate remedy for such violations.

     11.10    <u>Affiliate Systems</u>. Franchisee acknowledges that Franchisor and its Affiliates may operate one or more Affiliate Systems. For purposes of efficiency, or for other reasons, Franchisor and its Affiliates may coordinate and operate certain support functions, coordinate program between the System and Affiliate Systems. Such coordination will not be deemed a breach of this Agreement.

**Article 12    Insurance and Indemnity.**

     12.1    <u>Insurance Coverage</u>. During the Term, Franchisee shall comply with all insurance requirements of any lease, mortgage, or deed of trust covering the Property as well as all insurance requirements of Franchisor as set forth in the Brand Standards or as otherwise communicated by Franchisor. All insurance shall be procured at the earliest possible time that Franchisee has an insurable interest with respect thereto, and shall be written by insurance companies with an A.M. Best rating of AVI or greater. At a minimum, Franchisee shall maintain the following:

     A.    Comprehensive or commercial general liability insurance, for any claims or losses arising or resulting or pertaining to the Property or its operation, provided that, if the Property is managed by a property management company, business auto liability insurance, and worker's compensation insurance must be carried by such property management company. If the general liability coverage contains a general aggregate limit, it shall apply in the aggregate to this Property only. Such insurance shall be on an occurrence policy form and shall include premises and operations, independent contractors, blanket contractual, products and completed operations, advertising injury, employees as additional insureds, broad form property damage, personal injury, severability of interests, and explosion, collapse and underground coverage during any construction.

     B.    Business auto liability including owned, non-owned, and hired vehicles.

     C.    Umbrella excess liability insurance.

D.    Insurance on the Property (including furniture, fixtures, equipment, boiler, and machinery) against such risks as Franchisor may specify, including fire, lightning, vandalism, malicious mischief, and all other risks covered by the special extended coverage endorsements, in an amount equal to full replacement value thereof.

E.    If the Property is located in whole or in part within an area identified by the Federal Government as having a special flood hazard, flood insurance in an amount not less than the maximum coverable available under the National Flood Insurance Program and excess flood coverage with reasonable limits including business interruption coverage in an amount not less than that set forth in paragraph H below.

F.    If the Property is located in an "earthquake prone zone" as determined by the U.S. Geological Survey, insurance in an amount not less than the probably maximum loss less any applicable deductibles, including business interruption coverage in an amount not less than set for the in Paragraph H below.

G.    For properties under construction, a Builder's risk property insurance of not less than the full contract price.

H.    Business interruption insurance covering loss of profits and necessary continuing expenses, including coverage for payments of royalty fees and contributions to the Marketing Fund, for a minimum of three (3) months in the event of an interruption in Franchisee's business operations, as well as the cost of conducting a pre-opening review before reopening of the business in the event of closure for repairs or rebuild.

I.    Employee dishonesty coverage on all Property employees.

J.    Statutory Worker's Compensation insurance as required by applicable law, employer's liability insurance, and such other insurance with minimum limits as set forth in the Brand Standards.

K.    During construction at the Property (including the initial construction of the Property), Franchisee shall cause the general contractor to maintain, with an insurer carrying an A.M. Best rating of AVIII or greater, the following insurance:

(1)    Comprehensive or commercial general liability insurance, for any claims or losses arising or resulting or pertaining to the Property or its operation. If the general liability coverage contains a general aggregate limit, it shall apply in the aggregate to this Property only. Such insurance shall be on an occurrence policy form and shall include premises and operations, independent contractors, blanket contractual, products and completed operations, advertising injury, employees as additional insureds, broad form property damage, personal injury, incidental medical malpractice, severability of interests, and explosion, collapse and underground coverage during any construction.

(2)    Workers' compensation as required by applicable law, employer's liability insurance, and such other insurance as may be required by law.

(3)    Umbrella excess liability insurance.

(4)    Business auto liability insurance including owned, non-owned and hired vehicles.

12.2    Policy Requirements.  All policies of insurance (a) shall be written on a fully insured basis with no deductibles in excess of $50,000 nor any self-insured retentions, (b) shall name Franchisor and its affiliates and subsidiaries, Franchisor's and their respective officers directors, agents, partners and employees as additional insureds, except with respect to workers compensation insurance and other employee liability insurance, (c) shall be specifically endorsed to provide that the coverages will be primary and that any insurance carried by any additional insured, including the Indemnitees, shall be excess and non-contributory, (d) shall contain a waiver of any rights of subrogation against the Indemnitees, and (e) shall contain a severability of interest provision in favor of the Indemnitees.  At all times during the Term, Franchisee will furnish to Franchisor certificates of insurance evidencing the term and limits of coverage in force, names of applicable insurers, and persons insured, and a statement that coverage may not be canceled, or permitted to lapse or expire without 30 days' advance written notice to Franchisor.  Revised certificates of insurance shall be forwarded to Franchisor each time a change in coverage or insurance carrier is made by Franchisee and/or upon renewal of expired coverages.  At Franchisor's option, Franchisee may be required to provide certified insurance policy copies.  Franchisor may increase the minimum protection or coverage requirements of any policy required under this Article 12, and may require different or additional kinds of insurance at any time to reflect inflation, identification of special risks, changes in law or standards of liability, higher damage awards, or other relevant changes in circumstances.  Franchisee acknowledges and understands that Franchisor makes no representation or warranty with respect to the adequacy or sufficiency of the insurance required under this Article, and that Franchisee shall have the sole responsibility to determine whether additional insurance or higher limits are appropriate.

12.3    Franchisor Procurement.  If Franchisee does not obtain and maintain the insurance coverage required by this Agreement, as revised by the Brand Standards or otherwise in writing, Franchisor may, but shall not be obligated to, procure such insurance, and the cost or expense thereof, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon demand.

12.4    Indemnification.  Franchisee shall indemnify, hold harmless, and promptly reimburse the Indemnitees for, from and against any and all fines, damages, legal fees, costs, expenses, and other liabilities suffered or incurred by the Indemnitees by reason of any actual or threatened claim, demand, lawsuit, tax, penalty, investigation, or other proceeding (even where Indemnitee's negligence or other wrongful conduct is alleged) arising directly or indirectly from, as a result of, or in connection with (a) any application submitted to Franchisor, (b) the development, construction, operation, condition, use, occupancy, or sale of the Property, (c) any occurrence at or on the Property premises, (d) any environmental matters of any kind pertaining to the Property, (e) any breach of any terms and provisions of this Agreement by Franchisee, (f) any offering of securities, units, or other ownership interests of Franchisee, including, without limitation, the violation of any federal and/or state securities laws, (g) any allegation that the Franchisor is liable under federal or state employment or labor laws as the employer of Franchisee's employees, and (h) any breach by Franchisee of data privacy laws.  Upon Franchisor's request, Franchisee shall defend Indemnitees against all such matters.  In any event, Franchisor shall have the right, through counsel of its choice, to control any matter to the extent Franchisor reasonably determines that such matter may have a significantly adverse effect on Indemnitees.  Franchisee shall also indemnify and promptly reimburse Franchisor for all expenses reasonably incurred by Franchisor to protect itself from, or to remedy, any breach of this Agreement by Franchisee.  Franchisee's indemnity obligations under this Agreement shall survive the expiration or other termination of this Agreement and shall be in addition to all other rights and remedies of Franchisor.  Franchisee's obligations to indemnify Franchisor under this Article shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of its obligation to maintain insurance relieve Franchisee of liability under this indemnity provision or be construed to be a limitation on the amount of Franchisee's indemnity obligations.  The right of the Indemnitees to indemnity under this Agreement shall arise notwithstanding that joint or concurrent liability may be imposed on the Indemnitees by statute, ordinance, regulation, or other law.

12.5    <u>Notice of Claim</u>.  Franchisee shall notify Franchisor in writing within 5 days of receipt of notice or knowledge of any claim, dispute, loss, or damage in the amount of $25,000 or more, real or alleged, arising from Franchisee's activities in, at, or around the Property, whether or not such claim names Franchisor.  A quarterly notice will be provided by Franchisee to Franchisor regarding any claim, dispute, loss, or damage.  Franchisee has no authority to, and shall not, accept any service of process on behalf of Franchisor, any of its affiliated companies, or the Indemnitees.

12.6    <u>Data Security</u>.  Franchisee acknowledges and agrees that Franchisor and Franchisee each own the rights in and to any data captured by the Property Management System or Reservation System ("Guest Data") and that Franchisor may use Guest Data in any reasonable manner that it determines, subject to compliance with applicable laws, including data privacy laws.  Franchisee also acknowledges and agrees that it is obligated to comply with all information security and data privacy standards and requirements contained in the Brand Standards and all applicable federal and state laws, regulations, and standards relating to information security and data privacy, including, without limitation, the Payment Card Industry Data Security Standard ("PCI DSS").  Franchisee must secure all Guest Data against loss or theft and against unauthorized or unintended access, disclosure, copying, use or modification.  Franchisee agrees to notify Franchisor in writing as soon as practicable (and at least within 24 hours) of any known, suspected, or alleged security breach of Guest Data in Franchisee's possession or custody or under its control.  Franchisee also acknowledges and agrees that it is obligated to indemnify Franchisor from and against any claim resulting from any such data security breach by Franchisee or its employees or agents pursuant to Section 12.4 of this Agreement.  Without limiting the foregoing, to the extent Franchisor possesses or otherwise provides services that allow for the storage, processing, or transmittal of Guest Data as defined by the PCI DSS ("Services"), or to the extent Franchisor could impact the security of the Guest Data environment, Franchisor will remain in compliance with the applicable PCI DSS requirements with respect to those Services.  Franchisor will also remain aware of changes to the PCI DSS and implement all procedures and practices as may be reasonably necessary for the Services to remain in compliance with the PCI DSS, in each case at Franchisor's sole cost and expense.

## Article 13    Transfer of Interest or Management.

13.1    <u>Transfer by Franchisor</u>.  Franchisor shall have the right to transfer or assign all or any part of this Agreement, or all or any of its rights or obligations herein to any person or legal entity and any assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

13.2    <u>Transfer by Franchisee</u>.  This Agreement is not transferable by Franchisee except as permitted herein.  The rights and duties set forth in this Agreement are personal to Franchisee and are granted in reliance on the individual and collective business skill, financial capacity, and personal character of Franchisee and its owners.  Accordingly, neither this Agreement or the license granted hereunder, any part or all of any owner's direct or indirect ownership interest in Franchisee, the Property, nor a substantial portion of the Property's assets (collectively, the "Licensed Interests"), may be transferred by Franchisee without Franchisor's prior written approval, and then only in accordance with the provisions of this Agreement.  Any purported Transfer by Franchisee, by operation of law or otherwise, which is not permitted hereunder, shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may then terminate in accordance with Section 14.1C without opportunity to cure.

13.3    <u>No Security Interest</u>.  Franchisee shall grant no security interest, lien, mortgage, or deed of trust on any or all of the real estate or fixtures of the Property without prior written notice to Franchisor and then only if Franchisee agrees to request that the lender enter into a comfort letter as to such real estate and/or fixtures of the Property in form and substance reasonably acceptable to Franchisor.

13.4    <u>Transfer to Entity</u>. In the event that Franchisee is an individual and proposes, subsequent to the execution of this Agreement, to transfer this Agreement to a corporation, partnership, or limited liability company formed by Franchisee, Franchisor's consent to such transfer shall be conditioned upon satisfaction of and compliance with Section 7.15 of this Agreement and to the following additional requirements:

      A.    Franchisee shall be the owner of all of the voting stock, interests, or units of the corporation, partnership, or limited liability company; and, if Franchisee is more than 1 individual, each individual shall have the same proportionate ownership interest in the corporation, partnership, or limited liability company as he or she had in Franchisee prior to the transfer.

      B.    All transferors shall execute a written agreement personally guaranteeing the full payment and performance of Franchisee's obligations to Franchisor from the date of transfer and agreeing to be bound by all the terms and conditions of this Agreement.

13.5    <u>Death or Incapacity</u>. Upon Franchisee's death or Incapacity, or, if Franchisee is a corporation, partnership, or limited liability company, upon the death of an owner of a Controlling Interest or upon the determination by Franchisor that the owner of a Controlling Interest is Incapacitated, Franchisee's or such owner's executor, administrator, conservator, guardian, or other legally appointed personal representative must transfer Franchisee's interest in this Agreement or the owner's interest in Franchisee to a third party. Such disposition of this Agreement or the interest in Franchisee of an owner of a Controlling Interest (including, without limitation, transfer by bequest or inheritance) must be completed within a reasonable time, not to exceed 1 year from the date of death or Incapacity, and will be subject to all of the terms and conditions applicable to transfers contained in this Article 13. A failure to transfer Franchisee's interest in this Agreement or the interest of an owner of a Controlling Interest in Franchisee within this period of time constitutes a breach of this Agreement. Adequate provision must be made, in the sole discretion of Franchisor, for management of the Property during such period. Franchisee's interest in this Agreement or any owner's interest in Franchisee which is an entity may, with Franchisor's consent, which will not be unreasonably withheld, be transferred to the decedent's spouse, parent, sibling, or direct descendant or to spouse's direct descendant.

      A.    If, upon Franchisee's death or Incapacity, or upon the death or Incapacity of an owner of a Controlling Interest in Franchisee, the Property is not being managed by an approved management company, Franchisee's or the owner's executor, administrator, conservator, guardian, or other legally appointed personal representative must within a reasonable time, not to exceed 30 days from the date of death or declaration of Incapacity, appoint an approved management company to operate the Property. Such an approved management company may be appointed only with Franchisor's prior written approval and will be required to complete training at Franchisee's expense.

      B.    Pending the appointment of an approved management company as provided above or if, in Franchisor's reasonable judgment, the Property is not being managed properly at any time after Franchisee's death or declaration of Incapacity or after the death or declaration of Incapacity of an owner of a Controlling Interest in Franchisee, Franchisor has the right, but not the obligation, to appoint a property manager or management company for the Property. All funds from the operation of the Property during the management by Franchisor's appointed property manager or management company will be kept in a separate account, and all expenses of the Property, including compensation, other costs, and travel and living expenses incurred by the management company, will be charged to this account.

      C.    Franchisor also has the right to charge a reasonable management fee (in addition to the Royalty Fee and Marketing Fee payable under this Agreement) during the period that Franchisor's appointed property manager or management company manages the Property. Operation of the Property

during any such period will be on the transferee's behalf, provided that Franchisor only has a duty to utilize commercially reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses or expenses, or obligations incurred by the Property or to any creditors for any products, materials, supplies, or services the Property purchases during any period it is managed by Franchisor's appointed property manager or management company. The transferee will remain solely responsible for maintaining the Property during any period in which Franchisor's appointed property manager or management company is managing the Property on the transferee's behalf.

13.6    <u>Public and Private Offerings</u>. Securities, units, or other ownership interests in Franchisee may be offered by public or private offering, or otherwise, only with the prior written consent of Franchisor (whether or not Franchisor's consent is required under Section 13.2 of this Agreement). If Franchisee requests consent for a public offering Franchisor may grant or withhold its consent in its sole discretion based solely upon what Franchisor deems to be in its best interests. If Franchisee requests consent for a private offering, Franchisor will not unreasonably withhold its consent. All materials required for such offerings by federal or state law shall be submitted to Franchisor for review prior to their being filed with any governmental agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to their use. No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of Franchisee or Franchisor securities, and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor. Franchisee and the other participants in the offering must fully indemnify Franchisor in connection with the offering. For each proposed public offering, Franchisee shall pay to Franchisor an amount that covers Franchisor's reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. For each private offering of securities, Franchisee shall pay to Franchisor an amount that covers Franchisor's reasonable costs and expenses associated with reviewing the proposed private offering, including, without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least 90 days prior to the date of commencement of any public offering and at least 30 business days prior to the date of commencement of any private offering or other transaction covered by this Article.

13.7    <u>Transfer of Non-Controlling Interests</u>. Notwithstanding any provision to the contrary contained in this Article, Franchisee may transfer not more than an aggregate of 25% of the outstanding voting shares, units, or ownership interests of a Franchisee operating as a corporation, partnership, or limited liability company to employees of Franchisee who are actively engaged in the Property operations, if such transfers, alone or together with other previous, simultaneous, or proposed transfers, do not have the effect of transferring a Controlling Interest in Franchisee. The ownership of such shares, units, or ownership interests by such employees will be subject to all of the terms and conditions of this Agreement, including, without limitation, Article 11 and Article 13 of this Agreement. Franchisee shall provide Franchisor with written notice of any such proposed transfer and all pertinent information regarding the same not later than 30 days prior to the proposed date of transfer.

13.8    <u>Conditions of Transfer</u>. Franchisor shall not unreasonably withhold any consent required under this Article 13; provided, that Franchisor shall have the right to require any or all of the following as conditions of its approval of a Transfer:

A.    except for a Transfer pursuant to Sections 13.3, 13.4, 13.6 and 13.7, that each proposed transferee shall be required to submit an application for a new license. Franchisor will process such application in accordance with Franchisor's then-current procedures, criteria, and requirements regarding fees, upgrading of the Property, credit, operational abilities and capabilities, prior business dealings, and other factors Franchisor deems reasonable.

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

B.    that each transferor shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates, successors, and assigns, including, without limitation, claims arising under this Agreement, and any other agreement between Franchisee and Franchisor or its Affiliates;

C.    that the transferee or its owners shall guarantee, in a form satisfactory to Franchisor, the performance of all obligations of the Franchisee from the date of Transfer;

D.    if the proposed Transfer would result in a Change in Control of Franchisee, that the transferee shall execute the then-current form of Franchise Agreement being offered to new Franchisees for the full term.  The transferee shall execute such other ancillary agreements required by Franchisor for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, a higher royalty and/or advertising fee.

E.    if the proposed Transfer does not result in a change of control of Franchisee and does not have the effect of transferring a Controlling Interest in Franchisee, no application fee or Affiliation Fee shall be required under a new Franchise Agreement, but that Franchisee shall reimburse Franchisor for reasonable fees and expenses incurred by Franchisor in facilitating the proposed Transfer.

F.    if a proposed Transfer would result in a Change in Control of Franchisee, that Franchisee or transferee at its expense upgrades the Property to conform to the then current System standards and specifications, and completes the upgrading and other requirements within the time specified by Franchisor;

G.    that all monetary obligations of Franchisee hereunder shall be paid in full on a current basis, and Franchisee must not be otherwise in default of any of its obligations hereunder including, without limitation, its reporting obligations;

H.    if a proposed Transfer would result in a Change in Control of Franchisee, and if so requested by Franchisor after Franchisor has conducted a property inspection, transferor, at its expense, shall upgrade the Property to conform to the then-current standards and specifications of new Properties then-being established in the System, and shall complete the upgrading and other requirements set forth in this section within the time specified by Franchisor

I.    if a property inspection is conducted pursuant to Section 13.8 H., the transferor pays to Franchisor a property inspection fee of $5,000;

J.    that the transferor shall continue to be bound by, and remain liable for all of the obligations to Franchisor in connection with the Property that arose prior to the effective date of the Transfer, and any covenants that survive the termination or expiration of this Agreement, and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability; if a proposed Transfer would result in a Change in Control of Franchisee, at Franchisee's expense, the transferee, or, if the transferee is a business entity, one of its owners, shall complete to Franchisor's satisfaction all training programs required by Franchisor upon such terms and conditions as Franchisor may reasonably require, including the payment of a fee for attendance at such training programs (The transferee shall be responsible for the salary and all expenses of the person who attends training);

K.    If the proposed Transfer is not approved by Franchisor and Franchisee proceeds to transfer the Property or securities, units, or other ownership interests in Franchisee to any proposed new owner, then this Agreement shall terminate pursuant to Article 13 hereof and Franchisor will be entitled to

all of its remedies. Neither the Agreement, nor any rights hereunder shall be transferable in the event that the Franchisee is in default under the Agreement.

13.9    Management Company Approval. Franchisee shall not engage any management company to operate the Property without the prior written approval by Franchisor of the management company, which consent shall not be unreasonably withheld by Franchisor. To be approved by Franchisor, a proposed management company must be deemed by Franchisor, in its reasonable judgment, qualified to manage the Property. Franchisor's consent to a management company does not constitute an endorsement, recommendation, or validation of such management company, and Franchisor provides no guaranty or assurance that such management company will be successful. Franchisor may refuse to approve any proposed management company which, in Franchisor's reasonable judgment, is not financially capable or responsible, is inexperienced or unqualified in managerial skills or operational capacity or capability, or is otherwise unable to adhere fully to the obligations and requirements of this Agreement. Franchisor may also withhold its approval if the proposed management company does not provide Franchisor with all information that Franchisor may reasonably request in order to reach such decision. It is understood that confidential information and materials are, in the normal course of business, imparted to System Franchisees and managers, and Franchisor will be under no obligation to approve a proposed management company or replacement management company that is a franchisor or owner, or is affiliated or associated with the franchisor or owner, of a hotel or other lodging industry trade name that is competitive with Franchisor, irrespective of the number of hotels operating under such trade name. When Franchisor has approved in principle the management company nominated by Franchisee, Franchisee shall have the right to negotiate and execute a management agreement with such management company for the management and operation of the Property, subject to the terms, conditions, and obligations of this Agreement. Prior to such manager's assuming rights thereunder, the management agreement shall be submitted to Franchisor for Franchisor's written approval, which shall not to be unreasonably withheld. Such management agreement shall include provisions providing that (a) the manager shall have the authority and responsibility for the day-to-day management of the Property, (b) the Property will be operated during the term of the management agreement in such a manner as shall not detract from or modify the requirements of this Agreement or otherwise adversely affect the operation and management of the Property, (c) that the manager shall accept, abide by, and be subject to all rules, regulations, inspections, and requirements of Franchisor set forth in this Agreement, and (d) that if there is a conflict between the management agreement and the terms of this Agreement, then this Agreement shall govern and control.

13.10    No Waiver. Franchisor's consent to a Transfer by Franchisee of any interest in the license granted herein shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

**Article 14    Default and Termination.**

14.1    Franchisor's Right to Terminate. This Agreement may not be terminated prior to the expiration of the Term except as provided in this Article. Termination of this Agreement shall not relieve Franchisee of any unfulfilled obligations to Franchisor created hereunder unless it is so agreed by Franchisor in writing. This Agreement may be terminated as follows:

A.    By Franchisor in the case of a condemnation of a substantial portion of the Property in accordance with Section 7.16 of this Agreement.

B.    Upon the mutual agreement of the parties in writing to a termination.

WS Multistate 2/2018
(Franchise Agreement - Ex. C)

C.    At Franchisor's option, effective immediately upon the giving of written notice to Franchisee, if Franchisee (i) ceases to operate the Property or otherwise abandons the business, or forfeits the legal right to do business in the jurisdiction where the Property is located; (ii) is convicted of a felony or other crime involving moral turpitude, consumer fraud, or crime or offense Franchisor believes is likely to have an adverse effect on Franchisee's ability to carry out the duties imposed by this Agreement or to have an adverse effect on the System and the goodwill associated therewith; (iii) transfers (including transfers following death or Incapacity) of any rights or obligations in violation of the terms of Article 13 of this Agreement; (iv) misuses or discloses confidential information in violation of Article 11 of this Agreement; (v) knowingly makes any false statements in any report or document submitted to Franchisor; (vi) submits more than 2 written statements of Gross Room Revenue which under-report Gross Room Revenue for any reporting period by 5% or more; (vii) suffers a final judgment to remain unsatisfied or of record for 30 days or longer (unless supersede as bond is filed), or has execution levied against Franchisee's business or property, or any suit is filed to foreclose any lien or mortgage against the premises or equipment and not dismissed within 30 days; (viii) becomes insolvent or has a receiver appointed to take possession of Franchisee's business or property or any part thereof or makes a general assignment for benefit of creditors; (ix) engages in public conduct that reflects materially and unfavorably upon the operation of the System, the reputation of the System, or the goodwill associated with the Proprietary Marks; provided that engaging in legitimate political activity (including testifying, lobbying, or otherwise attempting to influence legislation) shall not be grounds for termination; (xi) is in default under any other Franchise Agreement or other agreement with Franchisor or any of its Affiliates which is not curable, or, if such default is curable, has not cured such default within the applicable cure period; or (xii) any Affiliate defaults under any Franchise Agreement or other agreement with Franchisor or any of its Affiliates which is not curable, or if such default is curable, has not cured such default within the applicable cure period.

D.    At Franchisor's option, without notice, in the event Franchisee shall become bankrupt or become subject to a proceeding under any chapter of the United States Bankruptcy Code, unless Franchisee shall: (i) timely undertake to reaffirm the obligations under the Agreement, (ii) timely comply with all conditions as legally may be imposed by Franchisor upon such an undertaking to reaffirm the Agreement, and (iii) timely comply with such other conditions and provide such assurance as may be legally required in or under relevant provisions of the United States Bankruptcy Code; provided, however, that the parties acknowledge that this Agreement constitutes a personal services contract made in reliance on the qualifications and personal characteristics of Franchisee and its directors, officers, managers, shareholders, members, or partners, as the case may be, and in the expectation of a material degree of personal involvement in the management and operation of the Franchised Business, and consequently, the parties agree that any attempt by any other party, including a trustee in bankruptcy or any other third party, to assume or accept a transfer or assignment of this Agreement shall be void, and that in no event shall this Agreement or any rights or duties of Franchisee hereunder, be transferred to any individual or entity who does not comply with all requirements for transfer specified in this Agreement.

E.    At the election of Franchisor, effective upon the expiration of 30 days after giving of written notice (10 days in the case of non-payment of any Payment or other financial obligation), in the event Franchisee defaults, and does not cure to Franchisor's reasonable satisfaction within the 30 day (or 10 day) notice period, in the performance of any other covenant or provision of this Agreement, including without limitation, the obligation to submit a site application, commence construction of the Property, complete construction of the Property, or open the licensed Property and commence operations within the time schedule established under Article 5 of this Agreement, the obligation to pay when due any financial obligation to Franchisor, the obligation to make reports and provide information when due hereunder, or failure to maintain any of the standards or procedures prescribed for the Franchised Business in this Agreement, the Brand Standards, or otherwise; provided, however, that Franchisee shall be entitled to notice and opportunity to cure any such default only once in any 6-month period, and any subsequent occurrence of the same or substantially similar default within such 6-month period shall entitle Franchisor,

at its option, to terminate this Agreement effective immediately upon the giving of notice and without opportunity to cure.

14.2    <u>No Waiver or Estoppel</u>.  No forbearance of Franchisor from asserting any default or giving any permitted notice of termination shall constitute a waiver of such default or right to terminate or an estoppel against such right as to any continuing default or subsequent occurrence of a default, whether similar or dissimilar in nature to the prior default.  The rights of Franchisor to terminate this Agreement are in addition to, and not in lieu of, other remedies available at law or equity for defaults by Franchisee in the payment and performance of its obligations hereunder.

14.3    <u>Suspension from Brand Channels</u>.  of If Franchisee's default is such that, in Franchisor's sole judgment, the Franchised Business does not fairly represent the quality and standards of the System, Franchisor may, temporarily in lieu of termination, remove the Franchised Business from marketing and registration channels and other "Brand Channels" generally available to all WoodSpring Suites Properties such as reservation websites, reservation telephone numbers, national accounts marketing and other such channels then in use.  Franchisor may also require Franchisee to hire a property management company or change property management companies.  Because fees charged by Franchisor for access to such marketing and registration channels are generally set to cover the cost of the channels and charged on a pro rata basis, Franchisee shall continue to pay such fees, so that Franchisee's default does not negatively impact other Franchisor Franchisees.  Franchisor's removal of the Franchised Business from Brand Channels, or requirement to change/hire property management company, will not constitute a waiver of Franchisor's right to terminate this Agreement due to the underlying default.

**Article 15    Obligations Upon Termination.**

15.1    <u>Post-Termination Obligations</u>.  Upon expiration or termination of this Agreement for any reason:

A.    All rights granted hereunder to Franchisee shall terminate.

B.    Franchisee shall immediately and permanently cease to operate the Franchised Business, and shall not thereafter, directly or indirectly, represent itself to the public or hold itself out as a Franchisee of Franchisor except if Franchisee operates other Franchised Businesses than the one terminated.

C.    Franchisee shall immediately and permanently discontinue the use of all Proprietary Marks, all similar names and marks, or any other designation or mark indicating or tending to indicate that Franchisee is or was a Franchisee of Franchisor.  Franchisee shall promptly amend or terminate any filings or registrations with any governmental authorities containing or pertaining to the use of Franchisor's name and Proprietary Marks.  Franchisee shall not promote or advertise the fact that it was formerly a Franchisee of Franchisor.

D.    Franchisee shall surrender and transfer to Franchisor or its designee any and all rights to use the telephone numbers and other business listings used by Franchisee for the Franchised Business.  Franchisee agrees to cooperate and execute any and all documents required to affect transfer of the telephone numbers and other business listings from Franchisee to Franchisor or its designee.

E.    Franchisee shall immediately turn over to Franchisor all materials, including, without limitation, the Brand Standards (in whatever form Franchisee may have) and all other Brand Standards, all customer and supplier lists, marketing materials, instructions, any Website references and brochures, and any and all other materials relating to the operation of the Franchised Business in Franchisee's possession, custody, or control, and all copies thereof (all of which are acknowledged to be

Franchisor's property), and shall retain no copy or record of the foregoing, excepting only Franchisee's copy of this Agreement and of any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

F.    Franchisee shall immediately and permanently discontinue all advertising as a Franchisee of Franchisor, including but not limited to removal of all signs and other identifying marks and colors, and shall destroy or surrender to Franchisor any letterheads, forms, printed matter, and advertising containing Franchisor's Proprietary Marks and any similar or related names marks or designations tending to indicate that Franchisee is or was an authorized Franchisee of Franchisor.

G.    Franchisee shall, at its expense, immediately make such modifications or alterations as may be necessary to distinguish the Property so clearly from its former appearance and from other System Properties as to prevent any possibility of confusion therewith by the public, and to prevent the operation of any business at the location of the Property by Franchisee or others in derogation of this Article (including, without limitation, removal of all distinctive physical identifying Property in the System including, without limitation, removal of all signs and emblems, and changing of telephone numbers and other directory listings). Franchisee shall, at Franchisee's expense, immediately make such specific additional changes as Franchisor may reasonably request for this purpose. Franchisee agrees that for 90 days following termination or expiration, Franchisor or its designated agents may enter the Property and adjacent areas, and hereby grants Franchisor an irrevocable license and permit to go upon the Property premises for such purposes, at any time to make such alterations, at Franchisee's sole risk and expense, without responsibility for any actual or consequential damages to the property of Franchisee or others. Franchisee acknowledges that such actions by Franchisor are authorized and permitted and shall not be deemed a violation of any civil or criminal law or any basis for an action under such laws by Franchisee or others. Franchisee expressly acknowledges that its failure to make such alterations will cause irreparable injury to Franchisor, and consents to entry, at Franchisee's expense, of an ex parte order by any court of competent jurisdiction authorizing Franchisor or its agents to take such action, if Franchisor seeks such an order.

H.    Franchisee shall immediately and permanently cease using Franchisor's System, including, but not limited to the Brand Standards, any other operating or training manuals or aids, intranet, advertising and promotional materials, and all confidential material delivered to Franchisee pursuant to this Agreement.

15.2    <u>Right to Purchase Inventory</u>. Within 10 days following termination of expiration, Franchisee shall provide Franchisor with an inventory of all items in the Property. Franchisor shall have the right, at its sole option, for a period of 60 days following receipt of such inventory list, to purchase at fair market value all usable materials owned by Franchisee bearing the Proprietary Marks, and/or to purchase Franchisee's FF&E and signage used in the Property or at the Approved Location at their fair market value. Franchisee shall not during such 60 day period remove from the Property or the Approved Location, transfer, assign, hypothecate, pledge, or otherwise encumber such FF&E or moveable signs.

15.3    <u>Payment of Fees</u>. Franchisee shall within 10 days from termination or expiration pay all sums owing to Franchisor and its affiliates. In the event of termination for any default of Franchisee, such sums shall include payment of all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property (including, without limitation, signage, equipment, furnishings, furniture, and supplies) owned and used by Franchisee in connection with the Property at the time of default.

15.4    Costs of Enforcement. Franchisee shall pay to Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with obtaining injunctive or other relief for the enforcement of any provisions of this Agreement.

15.5    Liquidated Damages. The parties recognize the difficulty of ascertaining damages to Franchisor resulting from premature termination of this Agreement and have provided for Liquidated Damages, which Liquidated Damages represent the parties' best estimate as to the damages arising from the circumstances in which they are provided and which are the only damages for the premature termination of this Agreement and not as a penalty or as damages for breaching this Agreement or in lieu of any other payment. Accordingly, if this Agreement is terminated pursuant to Sections 14.1C, 14.1D, or 14.1E, or by Franchisee without cause, Franchisee shall pay to Franchisor within 30 days of termination a lump sum payment (as liquidated damages and not as a penalty or in lieu of any other payments required under this Agreement) as follows:

A.    If the Agreement is terminated prior to Opening, an amount equal to the product of (i) the number of contractually approved Sleeping Rooms, multiplied by (ii) $25.00, multiplied by (iii) 36 months; or

B.    If the Agreement is terminated after Opening, an amount equal to the product of (i) the average monthly Gross Room Revenue during the prior 12 full calendar months (or such shorter time that the Property has been open), multiplied by (ii) the maximum Royalty Fee payable under Section 4.1B, multiplied by (iii) the number of months (including partial months, which will be prorated) between the date of termination and the end of the Term (not to exceed 60 months). However, the product of (i) multiplied by (ii) will not be less than the product of $25.00 multiplied by the number of contractually approved Sleeping Rooms.

C.    The amount of Liquidated Damages payable to Franchisor under this Section 15.5 shall be reduced by 20% (the "Discounted Liquidated Damages Amount") if, within 15 days of termination of this Agreement, Franchisee (i) discontinues all use of Franchisor's Proprietary Marks, (ii) pay all outstanding fees and charges due under this Agreement and any other franchise agreement between Franchisor or its Affiliate and Franchisee or its affiliate, and (iii) pay the Discounted Liquidated Damages Amount by certified or cashier's check. Notwithstanding the foregoing, if Franchisor terminates this Agreement pursuant to Section 14.1C(i) because Franchisee abandons the Property or stops operating the Property using the Proprietary Marks, Franchisor will reduce the amount of Liquidated Damages payable under this Section 15.5 by only 5%, provided that Franchisee complies with (i) through (iii) above.

15.6    Preservation of Records. Termination of this Agreement shall not relieve Franchisee of the obligations under Article 10 hereof to maintain and preserve financial and other records and to make them available for inspection and audit by Franchisor.

15.7    Survival of Terms. All covenants, obligations, and agreements of Franchisee which by their terms or by reasonable implication are to be performed, in whole or in part, after the termination or expiration of the Term, shall survive such termination or expiration.

15.8    Other Franchisee Properties. To the extent Franchisee is a franchisee of other Properties under other franchise agreements with Franchisor, which agreements are not terminated at the time of termination or expiration of this Agreement, the obligations of this Article 15 only apply to the Property subject to this Agreement.

**Article 16    Additional Covenants.**

16.1    <u>Independent Investigation</u>.  Franchisee agrees and acknowledges that, prior to executing this Agreement, Franchisee has made such independent investigation of Franchisor and the System as Franchisee deems necessary, that Franchisee understands that the results of operations of the licensed Property are dependent upon the efforts and management of Franchisee, and Franchisee hereby assumes full responsibility for such operations.

16.2    <u>No Fiduciary Relationship</u>.  It is understood and agreed by all parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venture, partner, employee, or servant of the other for any purpose whatsoever.  Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name or on Franchisor's behalf, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, or by reason of any act or omission of Franchisee in its conduct of the Franchised Business, or any claim or judgment arising therefrom against Franchisor.  Franchisee agrees that Franchisor is not in a position to, and does not undertake to, exercise control over the employment, supervision, or discharge of Property employees and has no right to do so, other than to the extent of controlling the quality of the System/brand and the quality of the products and services that Franchisee offers; Property maintenance; guest safety and health; or other matters arising out of or affecting Property operations, which are within the responsibility of Franchisee as a qualified independent business operator. Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a license from Franchisor.  Franchisee agrees to take such affirmative action as may be necessary to do so, including, without limitation, exhibiting a notice of that fact in a conspicuous place on the premises of the Franchised Business, and, as directed by Franchisor, in Franchisee's advertising and on Franchisee's agreements, forms, stationery, and promotional materials.

16.3    <u>Payments</u>.  All payments to Franchisor hereunder shall be made payable to Choice Hotels International, Inc. and, except as provided in the next sentence, shall be tendered to Franchisor in person at the address set forth in Article 18 below, or by making such Payment by mail, postage prepaid, or via overnight courier to that address.  At Franchisor's option, Franchisee shall make payments to Franchisor hereunder by wire transfer or electronic funds transfer to an account or accounts specified by Franchisor. All Payments received by Franchisor from Franchisee shall be applied in Franchisor's discretion to any outstanding obligation, regardless of any contrary designation by Franchisee.  Franchisee agrees that Franchisee will not, on grounds of the alleged non-performance by Franchisor of any of its obligations hereunder, withhold payment of any royalties, marketing and advertising contributions, amounts due to Franchisor for purchases by Franchisee, or any other amounts due Franchisor.

16.4    <u>Non-Solicitation</u>.  During the term of this Agreement or any subsequent franchise agreement, Franchisee shall not, either directly or indirectly, individually, or through, or on behalf of, or in conjunction with any person, persons, or entity employ or seek to employ any person who is or was within the immediate past 6 months employed by Franchisor or any other System Franchisee (except for System Franchisees who are Affiliates of the Franchisee) or induce or seek to induce any such person to leave his or her employment.  Franchisor shall not employ or seek to employ any person who is or was within the immediate past 6 months employed by Franchisee or induce or seek to induce any such person to leave his or her employment.  Any party violating the provisions of this Section 16.4 shall pay to the former employer as liquidated damages (which the parties agree are difficult of ascertainment) an amount equal to 2 times the annual salary of the employee involved, plus all costs and attorneys' fees incurred by the former employer in connection with such default.  The parties hereto agree that each current and future Franchisee in the System shall be a third party beneficiary of the provisions of this Section 16.4, and shall be entitled

to enforce the provisions hereof. Franchisor shall have no obligation to enforce the provisions of this Article for the benefit of any current or future Franchisee in the System or for the benefit of any franchisee of another brand or franchise system operated and managed by Franchisor or any of its Affiliates.

16.5    Child Protection Code of Conduct. Franchisor is a member of ECPAT-USA's Tourism Child-Protection Code of Conduct (www.thecode.org) ("The Code"), which is an industry-driven responsible tourism initiative with a mission to provide awareness, tools, and support to the tourism industry in order to prevent the sexual exploitation of children. Franchisee agrees to support the principles of The Code and to take all reasonable steps at the Property, including the training of staff, to recognize and prevent all forms of human trafficking.

**Article 17    Approvals and Waivers.**

17.1    Requests for Approval. Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent shall be obtained in writing. Except as otherwise expressly provided herein, Franchisor may withhold any consent or approval herein at its discretion. Franchisor shall have no liability for withholding any consent or approval or for any delay or inaction in connection therewith, and the granting of any approval or consent shall not imply or constitute any representation, warranty, guaranty, or endorsement of the matter approved or consented to or an assumption of any liability in connection therewith.

17.2    No Waiver. No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee, or any other Franchisee, of any of the terms, provisions, covenants, or conditions hereof shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power as against Franchisee, or as to subsequent breach or default by Franchisee. Subsequent acceptance by Franchisor of any obligations due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

**Article 18    Notices.**

All notices required or permitted under this Agreement must be in writing, must be personally delivered or mailed by registered or certified mail, return receipt requested, or by a nationally recognized delivery or courier service that allows tracking of packages or letters, to us at **Choice Hotels International, Inc., 1 Choice Hotels Circle, Suite 400, Rockville, Maryland 20850, Attention: General Counsel**, or at such other address Franchisor requires upon written notice to Franchisee, and to Franchisee at the Designated Representative's address set forth in **Recital E** of this Agreement. Franchisee authorizes the Designated Representative to submit written notices to Franchisor or receive Franchisor's written notices to Franchisee as its agent. Any notice by registered or certified mail or by delivery or courier service is deemed given and received at the date and time of sending. Franchisee may change the Designated Representative and/or the Designated Representative's address by written notice to Franchisor.

**Article 19    Dispute Resolution.**

19.1    Arbitration. Any controversy or claim arising out of or relating to this Agreement or any other related agreements, or the breach of this Agreement or any other related agreements, including any claim that this Agreement or any part of this Agreement or any related agreements is invalid, illegal, or otherwise voidable or void, as well as any claim that Franchisor violated any laws in connection with the execution or enforcement of this Agreement or any related agreements and any claim for declaratory relief, will be sent to final and binding arbitration in the state of Maryland before either the American Arbitration Association, J.A.M.S., or National Arbitration Forum in accordance with the Commercial Arbitration Rules

of the American Arbitration Association, including its rules for emergency measures of protection, except to the extent that the Commercial Rules of the American Arbitration Association may be interpreted to require Franchisee or Franchisor us to produce documents, witnesses, or information at a time other than at a hearing on the claim without Franchisor's mutual consent. In the event more than one demand for arbitration is filed in connection with this Agreement or any related agreements, the demand filed with the American Arbitration Association, J.A.M.S., or National Arbitration Forum office having jurisdiction over Maryland proceedings shall take precedence, and any other demand shall be withdrawn and presented in the Maryland filing. The arbitrator will apply the substantive laws of Maryland, without reference to its conflict of laws provision, except that nothing herein shall be construed to establish independently Franchisee's right to pursue claims under Maryland's Franchise Registration and Disclosure Law. Judgment on the arbitration award may be entered in any court having jurisdiction. If any party fails to appear at any properly noticed arbitration proceeding, an award may be entered against the party, notwithstanding its failure to appear. Any arbitration will be conducted at Franchisor's headquarters office in Maryland and the parties agree that any state laws attempting to prohibit arbitration in Maryland are pre-empted by the Federal Arbitration Act. Nothing in this Article 19 will be construed as requiring Franchisee or Franchisor to make a claim in arbitration before exercising any rights Franchisee or Franchisor may have to give notice of default or termination in accordance with the terms of this Agreement or any related agreements.

19.2    <u>Injunctive Relief</u>.  Notwithstanding anything to the contrary contained in this Article, Franchisee and Franchisor each have the right in a proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction. Franchisee acknowledges that a proper case to obtain temporary restraining orders and temporary or permanent injunctive relief from a court of competent jurisdiction shall include, but not be limited to, the following:

A.    Any Dispute involving actual or threatened disclosure or misuse of the contents of the Brand Standards or any other confidential information or Trade Secrets of Franchisor;

B.    Any Dispute involving the ownership, validity, use of, or right to use or license the Proprietary Marks;

C.    Any action by Franchisor to enforce the covenants set forth in Article 11 and Article 13 of this Agreement; and

D.    Any action by Franchisor to stop or prevent any threat or danger to public health or safety resulting from the construction, maintenance, or operation of the Property. The provisions of this Article are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

19.3    **MUTUAL WAIVER OF JURY TRIAL.  THE PARTIES AGREE THAT ALL DISPUTES ADMITTED TO THE COURT PURSUANT TO THIS PROVISION SHALL BE TRIED TO THE COURT SITTING WITHOUT A JURY, NOTWITHSTANDING ANY STATE OR FEDERAL CONSTITUTIONAL OR STATUTORY RIGHTS OR PROVISIONS.**

19.4    **MUTUAL WAIVER OF PUNITIVE DAMAGES.    NO PUNITIVE OR EXEMPLARY DAMAGES SHALL BE AWARDED AGAINST EITHER FRANCHISOR OR FRANCHISEE OR ANY AFFILIATES OF EITHER OF THEM, IN ANY PROCEEDING, AND ALL CLAIMS TO SUCH DAMAGES ARE HEREBY WAIVED.**

19.5    **MUTUAL WAIVER OF CLASS ACTIONS.   NEITHER FRANCHISEE NOR FRANCHISOR SHALL SEEK TO LITIGATE OR ARBITRATE AGAINST THE OTHER PARTY**

**TO THIS AGREEMENT OR SUCH PARTY'S AFFILIATES, EITHER AS A REPRESENTATIVE OF, OR ON BEHALF OF, ANY OTHER PERSON, CLASS, OR ENTITY, ANY DISPUTE, CONTROVERSY, OR CLAIM OF ANY KIND ARISING OUT OF, OR RELATING TO, THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES, THE SALE OF THE FRANCHISE, OR OTHER CLAIMS OR CAUSES OF ACTION RELATING TO THE PERFORMANCE OF EITHER PARTY TO THIS AGREEMENT. NO ARBITRATION OR OTHER ACTION OR PROCEEDING UNDER THIS AGREEMENT SHALL ADD AS A PARTY, BY CONSOLIDATION, JOINDER, OR IN ANY OTHER MANNER, ANY PERSON OR PARTY OTHER THAN FRANCHISOR AND FRANCHISEE AND ANY PERSON IN PRIVITY WITH, OR CLAIMING THROUGH, IN THE RIGHT OF, OR ON BEHALF OF, FRANCHISOR OR FRANCHISEE, UNLESS BOTH FRANCHISOR AND FRANCHISEE CONSENT IN WRITING. FRANCHISOR HAS THE ABSOLUTE RIGHT TO REFUSE SUCH CONSENT. FRANCHISEE AGREES AND ACKNOWLEDGES THAT ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING FROM OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP BETWEEN THE PARTIES, OR ANY AGREEMENT OR RELATIONSHIP BETWEEN FRANCHISOR AND FRANCHISEE OR ANY AFFILIATE OF FRANCHISOR'S WILL BE CONSIDERED UNIQUE ON ITS FACTS AND MAY NOT BE BROUGHT AS A CLASS OR GROUP ACTION.**

19.6    <u>Franchisor's Business Judgment</u>. The parties hereto recognize, and any arbitrator or judge is affirmatively advised, that certain provisions of this Agreement describe the right of Franchisor to take (or refrain from taking) certain actions in the exercise of its discretion based on its assessment of the overall best interest of the network and/or license program. Where such discretion has been exercised, and is supported by the business judgment of Franchisor, neither an arbitrator nor a judge shall substitute his or her judgment for the judgment so exercised by Franchisor.

19.7    <u>Legal Fees</u>. In the event Franchisor incurs legal fees or costs or other expenses to enforce any obligation of Franchisee hereunder, or to defend against any claim, demand, action or proceeding by reason of Franchisee's failure to perform or observe any obligation imposed upon Franchisee by this Agreement, then Franchisor shall be entitled to recover from Franchisee the amount of all legal fees, costs and expenses, including reasonable attorneys' fees, whether incurred prior to, or in preparation for or contemplation of the filing of any claim, demand, action, or proceeding to enforce any obligation of Franchisee hereunder or thereafter or otherwise.

**Article 20    Entire Agreement/Amendment.**

Franchisor and Franchisee each acknowledge and warrant to each other that they wish to have all terms of their business relationship defined in this written Agreement. Neither Franchisor nor Franchisee wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different than or supplementary to the rights and obligations set forth herein. Accordingly, Franchisor and Franchisee agree that this Agreement, together with any other documents or agreement executed by the parties contemporaneously hereto, supersede and cancel any prior and/or contemporaneous discussions (whether described as presentations, inducements, promises, agreements, or any other term), between Franchisor or anyone acting on its behalf and Franchisee or anyone acting on his or her behalf, which might be taken to constitute agreements, representations, inducements, promises, or understandings (or any equivalent to such terms) with respect to the relationship between the parties, and Franchisor and Franchisee each agree that they have placed, and will place, no reliance on any such discussions; provided, however, that nothing in this Agreement or any related document is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document furnished to Franchisee. This Agreement, together with any other documents or agreements executed by the parties contemporaneously hereto, constitutes the entire agreement between the parties and contains all of the terms, conditions, rights, and obligations of the

parties with respect to any aspect of the relationship between the parties. No future license rights or offer of license rights have been promised to Franchisee and no such license rights or offer of license rights shall come into existence, except by means of a separate writing, executed by an officer of Franchisor or such other entity granting the Franchise Agreement and specifically identified as a modification of this Agreement. No change, modification amendment or waiver of any of the provisions hereof, including by custom or usage of trade or course of dealing or performance, shall be effective and binding upon either party unless it is in writing, specifically identified as an amendment hereto, and signed by the party to be charged.

**Article 21     Construction and Modification.**

21.1     Governing Law. This Agreement is governed by and shall be interpreted and construed in accordance with the substantive laws of the State of Maryland, without giving effect to its conflicts of law provisions, except that nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchisee Registration and Disclosure Law.

21.2     Severability. Should any one or more parts of this Agreement be declared invalid for any reason by a court of competent jurisdiction, such decision shall not affect the validity of any remaining portions of the Agreement, which shall remain in full force and effect as if the Agreement had been executed without such invalid parts, except to the extent the absence of the provisions invalidated would frustrate or make it impossible to achieve the purposes for which the Agreement was made. Should the requirements of any applicable law or regulation change or modify the terms of this Agreement or conflict with its provisions, such change or modification shall not be applicable to this Agreement unless such change is lawfully mandated by the authority making the same, in which case only the provisions affected by such law or regulation shall be affected, and the Agreement shall otherwise remain in full force and effect, as modified to be consistent with such law or regulation.

21.3     No Third Party Beneficiaries. This Agreement is made solely for the benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein shall create any right to rely upon the terms hereof in favor of any third party nor confer any right or remedy upon any third party.

21.4     Captions. All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provisions hereof.

21.5     References. All terms and words used in this Agreement, regardless of numbers and genders in which they are used, shall be deemed to include singular or plural and all genders as the context or sense of this Agreement or any paragraph or clause herein may require.

21.6     Joint and Several. All acknowledgments, promises, covenants, agreements, and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all those executing this Agreement on behalf of Franchisee.

21.7     Time of the Essence. Time is of the essence of this Agreement and all provisions hereof shall be so interpreted. Any provision of this Agreement which imposes an obligation after termination or expiration of this Agreement shall survive such termination or expiration.

21.8     Cumulative Rights. No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

**Article 22       Execution of Agreement.**

22.1    <u>Counterparts</u>.  This Agreement may be executed in counterparts, which together shall constitute one agreement of the parties.

22.2    <u>Seal</u>.  This Agreement is a contract under seal and is intended by the parties to be a specialty under Maryland law.

22.3    <u>Electronic Signatures</u>.   The parties hereby acknowledge and agree that electronic signatures, facsimile signatures or signatures transmitted by electronic mail in so-called "pdf" format shall be legal and binding and shall have the same full force and effect as if an original of this Agreement had been signed and delivered by hand.  Franchisor and Franchisee both (i) intend to be bound by the signatures (whether original, faxed or electronic) on any document sent by electronic means, (ii) are aware that the other party will rely on such signatures, and (iii) hereby waive any defenses to the enforcement of the terms of this Agreement based on the foregoing forms of signature.

22.4    <u>Franchise Disclosure</u>.  By signing this Agreement, Franchisee acknowledges that it has received a complete copy of this Agreement, with any attachments, schedules, and exhibits referred to herein attached, at least 7 calendar days prior to the date on which this Agreement was executed, and further acknowledges that it has received Franchisor's franchise disclosure document at least 14 calendar days prior to the date on which this Agreement was executed or any money paid, or by such earlier date as may be required by state law.  Franchisee further acknowledges that no agent or employee of Franchisor is authorized to make any representation or warranty inconsistent with or in addition to the terms of this Agreement.  By signing this Agreement, Franchisee represents and warrants to Franchisor that no such representation or warranty, including specifically any representation as to the potential success or profitability of the Franchised Business, has been made or relied upon.

**[Remainder of page intentionally left blank.  Signature page follows]**

We and you agree to be bound by the terms and conditions of this Agreement, including all Attachments, by setting the hands and seals of our duly authorized and empowered representatives on this Agreement, effective as of the Effective Date.

**Choice Hotels International, Inc.,**
a Delaware corporation

By: _____ (Seal)
Name: Christopher J. Wallace
Title: Vice President and Assistant General Counsel

**POSH PROPERTIES NO. 41, WOODHAVEN, LLC, a Pennsylvania limited liability company**

By: _____ (Seal)
Name: Joseph C. Posh
Title: Manager

Date: 4-19-18

45

**Schedule A – Entity Ownership Breakdown**

By initialing this Schedule A that is attached to the Franchise Agreement, you certify that the information provided below is true and accurate.  The following represents the names and percentages owned of **POSH PROPERTIES NO. 41, WOODHAVEN, LLC.**

| _Name of member/shareholder/partner_ | _Percentage owned_ |
|---|---|
| Joseph C. Posh | 100% |

**INITIAL HERE** 

## ATTACHMENT A

## PROPERTY IMPROVEMENT PLAN

[This Attachment A is intentionally left blank]

## ATTACHMENT B

## RIDER TO THE FRANCHISE AGREEMENT

1.    **Exclusive Territory.**  We will not permit another **WoodSpring Suites** Choice Mark franchise to open and operate during the Term (the "Exclusive Territory Period") in the area outlined below (the "Exclusive Territory"):

> Within a 3-mile radius of the Hotel.

You acknowledge that this Section 1 applies only to applications for new franchises within the Exclusive Territory and is not triggered by the relicensing of an existing hotel that uses the **WoodSpring Suites** Choice Mark.  You further acknowledge that the Exclusive Territory excludes any hotels for which we already have an approved application or executed franchise agreement prior to the effective date of the Agreement.  If you do not have an approved site for the Hotel as of the effective date of the Agreement, you acknowledge that we will have the right to modify the Exclusive Territory based on the location of the approved site as a condition of our approval.  We also reserve the right to replace any hotels using any of the Choice Marks within the Exclusive Territory.

During the Exclusive Territory Period, you agree not to oppose, challenge or otherwise file any legal action in connection with any such application, except to the extent that the approval of such application is prohibited by the provisions of this Section 1.

The Exclusive Territory during the Exclusive Territory Period is exclusive to you and is not transferable to any other party.  Nothing in this Section 1 prevents us from granting a franchise using a Choice Mark other than **WoodSpring Suites**.

Notwithstanding anything to the contrary stated in this Section 1, all hotels that are authorized to use any of the Choice Marks will retain each and all of their rights under the Fair Franchising Policy.

2.    **Effect of Default.**  Unless and until you default under the terms of the Agreement, the modifications referred to in Section(s) 1 of this Attachment will remain in effect.  For the purposes of this section, the term "default" shall mean any violation of the Agreement that is not cured within any applicable cure period pursuant to Section 14.1.E of the Agreement, or any violation of the Agreement that is not subject to an opportunity to cure pursuant to Section 14.1.C. or 14.1.D. of the Agreement.  The referenced modification(s) are exclusive to you and are not transferable to any other party.

3.    **Transfer of Ownership**.  Notwithstanding anything contained in Section 13.4 of the Agreement, you may transfer a direct or indirect interest in the Hotel or in the Agreement without payment of any affiliation fee to a limited liability company, a corporation, or a partnership (the "Alternate Entity") if each of the following conditions is satisfied:

(a)    The transfer to the Alternate Entity is made within 12 months of the Effective Date;
(b)    You send us prior written notice of the transfer;
(c)    You are not in default under the Agreement;
(d)    You sign and deliver to us a general release of all claims you may have against us;
(e)    You will own a majority of the beneficial interest in the Alternate Entity after the transfer;
(f)    The Alternate Entity assumes, in a writing that we accept, your obligations under the Agreement;
(g)    You agree that you are not relieved of your obligations under the Agreement unless we specifically release you in writing;
(h)    The transferee submits evidence to us that it owns the Hotel; and
(i)    We approve of the transfer after our credit and legal review.

4.      **Confidentiality**. You agree to keep the grant of the modification(s) contained in this Attachment B in strict confidence and will not disclose them to any persons other than your directors, officers, partners, employees, agents and advisors who have a need to know for the purpose of operating the Hotel. Any unauthorized disclosure is a default under the Agreement, and we may, at our option, immediately terminate the Agreement on notice to you or may revoke the modification(s) contained in this Attachment B upon any unauthorized disclosure by you. The modification(s) outlined in this Attachment B are for the Hotel only and do not indicate that other hotels owned by you or by others will receive similar modification(s). You acknowledge and agree that nothing in this Section prohibits us from disclosing the terms of this Attachment to any vendors, lenders, or other third parties as we determine in our reasonable discretion.

5.      **Defined Terms; Integration.** Certain capitalized terms may not be defined in this Attachment B or the Agreement and such terms are being used in the normal course of dealing and as commonly used in the hospitality industry in order to assist you to better understand your obligations under this Attachment B. This Attachment B is incorporated into and will become a part of the Agreement when duly signed.

6.      **Order of Precedence**. In the event of any conflict inconsistency between the terms of the Agreement and the terms of this Attachment B, the terms of this Attachment B will supersede and control. In all other respects, the terms of the Agreement are ratified and confirmed.

**ATTACHMENT C**

**PERSONAL GUARANTY**